MINNELUSA OIL CORPORATION v. DE LARM
KYTE v. TWIFORD

(No. 2178; March 11, 1941; 111 Pac. (2d) 107)

For the appellant there was a brief and oral argument by *George M. Porter* of Crawford, Nebraska.

466

For the respondent, there was a brief by *H. B. Durham* and *C. M. Crowell* of Casper, and oral argument by *Mr. Crowell.*

RINER, Chief Justice.

This is a cause here by direct appeal from a judgment of the district court of Niobrara County. The real controversy is between two defendants therein, C. H. Kyte and Harry G. Twiford, made parties to the litigation through a petition in the nature of a bill of interpleader filed by the Minnelusa Oil Corporation. The trial was to the court without the intervention of a jury, and the facts are to be found in the admissions of the pleadings filed by the respective parties and a stipulation of submission of the cause to the district court upon an agreed statement of facts. As will hereinafter appear, the problem to be solved by the district court and by this court is the proper construction of an instrument designated "Assignment of Royalty Interest in the Buck Creek Oil Company, Incorporated in Wyoming"—and therefore simply a question of law. The judgment aforesaid was in favor of Twiford and against Kyte. The circumstances which led to the institution of this litigation are briefly these:

The locators of an oil placer mining claim on the Northeast Quarter of the Northeast Quarter of Section 8, Township 35 North, Range 65 West of the 6th P. M., leased on December 30, 1919, and for a 12½ per cent royalty the forty acres just described to the Buck Creek Oil Company, a Wyoming corporation. It was at the same time agreed between the lessors aforesaid and their lessee corporation just mentioned that it should on behalf of said lessors make application to the proper authority for an oil and gas lease from the United States of America to said locators after the enactment of the so-called "Leasing Bill" authorizing the leasing of the public lands of the United States for drilling for oil and gas, and this application was in due time made. This agreement also provided that the royalty under the Buck Creek Oil Company lease, al-

ready mentioned, should be 12½ per cent "of the balance after deducting the royalty to be paid under" the lease from the United States.

January 23, 1920, the aforesaid locators conveyed to Twiford, the respondent herein, "an undivided one-ninth of nineteen-twentieths of a 12½ per cent royalty in and to" the property above described. May 6, 1922, the United States of America gave a lease for the purpose of drilling for oil on that property and other lands to Twiford, together with other assignees of the original locators and the remaining locators, certain specified royalties "on all oil and gas produced from the land leased" being required to be paid to the lessor, the minimum of which royalties was 12½ per cent, together with a rental of "one dollar per acre per annum," which rental was yearly credited on the royalty paid for that year.

July 21, 1924, Twiford made an assignment to one T. A. Larson, which reads:

### "ASSIGNMENT OF ROYALTY INTEREST IN THE BUCK CREEK OIL COMPANY, INCORPORATED IN WYOMING

"I, Harry G. Twiford, of Casper, Natrona County, Wyoming, assignor, for and in consideration of One ($1.00) Dollar and other valuable consideration to me in hand paid by T. A. Larson of Casper, Natrona County, Wyoming, assignee, do hereby assign, transfer, convey and set over unto the said T. A. Larson, of Casper, Natrona County, Wyoming, assignee, all my right, title and interest in my royalty and in my royalty contract in and with the Buck Creek Oil Company, incorporated in Wyoming, consisting of 1/9 of 19/20 of 12½% of the gross oil production taken from the following described land, to-wit:

Northeast quarter of the Northeast quarter (NE¼NE¼) of Section Eight (8), Township Thirty-five (35) N. Range Sixty-five (65) West of

the 6th P. M., County of Niobrara, State of Wyoming

and I hereby authorize and direct the Buck Creek Oil Company, incorporated in Wyoming, to recognize this assignment and from this date to make all royalty payments accruing under the royalty and royalty contract above described to T. A. Larson, assignee.

> (Signed)  Harry G. Twiford
> Assignor"

The assignor's signature to the instrument was duly attested, its execution acknowledged by Twiford, and it was recorded July 23, 1924, in the office of the County Clerk of Niobrara County, Wyoming.

On January 28th of the year following, Larson assigned to one M. I. Olson all of the former's "right, title and interest in and to that certain assignment from Harry G. Twiford to him under date of July 21, 1924."

Meanwhile, during all this period and until some time in the year 1927 the lease to the Buck Creek Oil Company, above described, remained in force. In that year—the exact date does not appear in the record— the Buck Creek Oil Company abandoned and surrendered its lease.

Active work on the land in question, except as required by the United States lease, seems to have ceased for approximately ten years. Then and on March 16, 1937, M. I. Olson aforesaid transferred to C. H. Kyte, the appellant herein, "all of my royalty interest and all of my oil and gas rights in and to" the property described in the Twiford assignment and set forth above, together with other lands. The following June 15th of that year Twiford, his co-lessees on the United States lease, or their assignees, gave to the J. M. Huber Corporation an assignment of the aforesaid govern-

ment lease, together with an operating agreement upon the lands covered thereby. This contract with the J. M. Huber Corporation provided for a 7½ per cent overriding royalty "of the gross oil and gas produced from" the lands here involved, after payment of the royalty due the United States. This contract was not signed nor ratified either by Kyte or by M. I. Olson, except so far as the last mentioned party is concerned, as hereinafter indicated. Thereafter and during the month of March, 1938, M. I. Olson,, as the "owner and assignee of certain interests of Charles C. Williams, named as one of the lessees" in the lease from the United States aforesaid, ratified and confirmed the J. M. Huber Corporation contract mentioned above. Subsequently that contract was assigned to the Minnelusa Oil Corporation, which "is now the sole assignee of all the interests of said J. M. Huber Corporation * * * and as such is now engaged in the development of the oil and gas resources therefrom and has deposited in escrow in the Lusk State Bank, the amounts alleged by it to be due thereunder to the lessees under the lease from the United States and their respective assignees, as directed by a prior order of this Court, to await a determination of the parties entitled thereto and the amount of their respective interests in the said land, lease, royalties and escrowed moneys."

The plaintiff, Minnelusa Oil Corporation, October 14, 1938, filed its petition aforesaid, setting forth the necessary facts and asking among other requests that "the defendants herein be required to interplead together and set forth their rights and matters as between themselves and each as against the other concerning the above sum of $3,416.94 constituting proceeds of 7½% overriding royalty on the production from said Northeast Quarter of the Northeast Quarter to the date of the institution of this action and as to any further sums which may be deposited in escrow

derived from said production during the pendency of this action." Subsequently Kyte and Twiford, by proper pleadings, set forth their respective asserted rights and claims to the fund disposed of by the Minnelusa Oil Corporation, as indicated above.

The exact controversy between Kyte and Twiford, as hereinbefore suggested, grows out of the proper interpretation of the words quoted above and contained in the assignment of Twiford to Larson, acknowledged July 21, 1924, as follows:

"* * * all my right, title and interest in my royalty and in my royalty contract in and with the Buck Creek Oil Company, incorporated in Wyoming, consisting of 1/9th of 19/20ths of 12½% of the gross oil production taken from the following described land."

The district court determined that by this language under the facts appearing in the record and as claimed by Twiford, the intention of the parties as to the assignment in question was to transfer to Larson "only Twiford's royalty interest in the lease to the Buck Creek Oil Company", and its judgment was accordingly thus rendered. Kyte asserts that this judgment is erroneous and that not only was Twiford's interest in the Buck Creek Oil Company lease transferred to Larson but also all of Twiford's right, title and interest "in my royalty", i.e., in any interest he, Twiford, owned in the government lease aforesaid, and consequently Kyte and not Twiford was entitled to have his proper share of the escrow moneys aforesaid which came into existence long after the Buck Creek Oil Company had severed its connection with these lands through its surrender of its lease in 1927.

We are inclined to think that the judgment of the district court of Niobrara County was correct for a number of reasons, among them being these:

The title of the instrument in question reads, as we have seen, "Assignment of Royalty Interest in the

Buck Creek Oil Company, Incorporated in Wyoming". This would appear to be a clear declaration that only Twiford's royalty interest in the Buck Creek Oil Company was intended to be transferred. Counsel for Kyte remind us of the rule as stated in 6 Ruling Case Law 836, Section 226:

"Neither the form of a contract nor the name given it by the parties controls its interpretation. In determining the real character of a contract courts will always look to its purpose, rather than to the name given it by the parties."

In the instant case the name of the instrument, viz., "assignment", is supplemented by the statement "of royalty interest in the Buck Creek Oil Company, Incorporated in Wyoming", which statement would seem to be a short designation of the description of what was intended to be assigned. In other words, we have here considerably more than the simple name of the instrument.

In Hurst v. Winchester Bank, 154 Ky. 358, 157 S. W. 685, 687, the court remarked:

"We have kept in mind the well-settled rule that a court, when it comes to construe a writing, is not to be controlled altogether by the name that the parties have given it, but will look to the paper and determine for itself the nature and quality of the writing. If it is in fact a mortgage, although it may be called a deed, or is in truth a contract of sale and purchase, although designated a mortgage, the court, while giving due consideration to the acts of the parties in describing the paper, will not permit injustice or fraud to be practiced by following the title given to the paper by the parties, but will so construe it as to carry out what the facts show was their real intention in its execution."

Similarly in Vautrain v. Neel (Caumont, Intervenor) 163 So. (La. App.) 555, 557, the court said:

"Upon the first point made by intervener, we observe that the name given to an instrument by the

parties, or by an official charged with its recordation, is not conclusive of its character and legal effect."

And in Pan-American Bank & Trust Company v. National City Bank of New York, 6 Fed. 2d 762, 766, we find the United States Circuit Court of Appeals for the Second Circuit using this language:

"But it is clear that the legal effect of what men do is not determined by the names they affix to their deeds. The essential nature of their acts determines, and the law has its own names for the results they achieve. Border Bank v. American Bank (C. C. A.) 282 F. 73; Second National Bank v. Columbia, etc. Co. (C. C. A.) 288 F. 17, 30 A. L. R. 1299. Undoubtedly the names by which men describe their acts are evidence of the nature of their doings, often strong evidence."

It is evident from these authorities that while the name given an instrument is not *conclusive* evidence of what it really is or of its true interpretation, still this name may be looked to as disclosing evidence of what was intended to be conveyed by the document at whose commencement the name appears. We think that this is especially so in the case at bar, where in addition to the name "assignment" there appears also an indication of what was intended to be transferred by such assignment. Just here it may be observed as well that it would seem strange to find Twiford, more than ten years after the Buck Creek Oil Company had surrendered its lease, joining in another lease and operating agreement on the property in question if he thought that by the assignment to Larson, aforesaid, he, Twiford, had transferred all his royalty interest in the government lease to Larson. Twiford apparently entered into this lease and operating agreement with the J. M. Huber Corporation, aforesaid, before any worth while returns had been obtained from the property in question and certainly before, so far as this record shows, any disagreement had arisen between Twiford and Kyte.

Again, the lease from the United States to Twiford et al. was made, as we have seen, on May 6, 1922. The assignment to Larson was acknowledged July 21, 1924. By the United States or government lease Twiford and his co-lessees agreed "not to assign this lease or any interest therein, not sublet any portion of the leased premises, except with the consent in writing of the Secretary of the Interior first had and obtained." If it were intended by Twiford to transfer all his interest in said lease to Larson by the assignment he gave the latter, it would seem that under the foregoing provision of the government lease the consent of the Secretary of the Interior should have been obtained or contemplated, but no agreement of that kind was evidently made. It would seem likewise significant that in the subsequent J. M. Huber Corporation contract it was contemplated that such consent should be forthcoming, for that contract provided among other things . that the corporation last named should "furnish with proper and sufficient surety to the satisfaction of the United States, the bond required under said lease and its rules and regulations", and "second party will pay the royalties to the United States reserved in and by said lease, in accordance with the terms and provisions thereof, and will otherwise keep, do, perform and observe all the terms, covenants and conditions thereof to be kept, done, performed and observed by lessees, as in said lease provided". If it was intended by Twiford to transfer all his royalty interest in the government lease to Larson by the assignment in question, consent thereto by the Secretary of the Interior would appear to have been necessary.

In Burck v. Taylor, 152 U. S. 634, 14 S. Ct. 696, 38 L. Ed. 578, Mr. Justice Brewer, speaking of a contract containing a prohibition against its assignment without the written consent of the proper authorities, said:

"It was a stipulation which was one of the terms of

the contract and binding upon the contractor, and equally binding upon all who dealt with him. It is unnecessary to hold that the contractor might not be personally bound upon his promise made before the performance of the contract to transfer a portion of his profits to any third party. Whatever liabilities he might assume by such a promise, it would be an independent promise on his part, and would not let the promisee into an interest in the contract. It would give him no right to take part in the work, no right to receive anything from the state, and all that it would give him would be an independent right of action against the contractor for the failure to pay that which he had promised to pay; the contract remaining all the time the property of the contractor, subject to disposal by and with the consent of the state. To him alone the state would remain under obligations, and with him alone would the state be required to deal. In no way, by garnishment, injunction, or otherwise, could the promisee prevent the state from carrying out the entire contract with the contractor, paying to him the whole consideration, and receiving from him a full release."

However, the parties to the Larson assignment apparently did not deem such procedure at all necessary, and a fair implication from such conduct would be that the effect of the assignment in question was confined to the Buck Creek Oil Company agreement, which contained no such prohibition, but on the contrary was to be binding upon "the assignees of the respective parties" thereto.

We may additionally observe that the concluding language of the assignment from Twiford to Larson likewise would also appear to be significant. That language directs the Buck Creek Oil Company "to recognize this assignment" and to make "all royalty payments accruing under the *royalty and royalty contract above described" to Larson.* In this connection it should not be overlooked that this phraseology directly refers to the preceding granting clause of the instru-

ment and the royalty payments accruing to Twiford "under the royalty and royalty contract in and with the Buck Creek Oil Company" and that those only are required to be paid over by that company to the assignee Larson. The assignment did not undertake to deal with any royalty that was due to Twiford and which grew out of the government lease. Accordingly, when the Buck Creek Oil Company surrendered its rights, it put an end to any claim under the lease held by that company but left unaffected any royalty due Twiford under the government lease. In short, the words "royalty" and "royalty contract" were used to designate the rights growing out of the Buck Creek Oil Company lease and those alone.

Finally, we note that it is stipulated in the agreed statement of facts:

"Neither the said C. H. Kyte or his mesne assignors, Larson and Olson, were parties to or signed said J. M. Huber Corporation contract referred to in preceding paragraph No. 9 a, that said instrument, Exhibit 'G' not then having been completed by delivery to C. H. Kyte, said M. I. Olson, with the consent and approval of said C. H. Kyte made, executed and delivered to J. M. Huber Corporation and Manning & Martin (who became interested in said lease with said corporation) an instrument ratifying said Exhibit 'H', a full, true and correct copy of which ratification of assignment is hereto attached as Exhibit 'I' and made a part hereof." From this statement, taken in conjunction with other stipulated facts, we conclude the situation of these parties was as follows: That neither Olson nor Kyte signed or were parties to the contract of Twiford et al. with the J. M. Huber Corporation dated June 15, 1937, and referred to in the quoted portion of the stipulation, supra, as Exhibit "H"; that Exhibit "G" is the assignment described above from Olson to Kyte and is dated March 16, 1937; that while this instrument appears to have been thus dated, it was *not then* completed by de-

livery to Kyte until later (precisely when is not clear) ; that Olson, with Kyte's consent and approval, executed an instrument designated "Exhibit I" which ratified the J. M. Huber contract.

With these facts in mind we examine Exhibit I, only to find that it is dated and acknowledged "this ........ day of March, 1938", and that Olson ratified said J. M. Huber Corporation contract merely on behalf of one Charles C. Williams, whose interest in the J. M. Huber Corporation Olson therein declares himself to be the owner. Olson does not undertake to ratify that contract on behalf of Kyte, nor does the latter undertake to so ratify said contract on his own behalf. The parties to the transaction appear to have regarded Kyte as not having any connection with the J. M. Huber Corporation contract, which, as we have seen, was assigned to the plaintiff, Minnelusa Oil Corporation. A fair conclusion from this phase of the matter is that Kyte had no interest whatsoever in the J. M. Huber Corporation contract, which would call for either his signature thereto or a ratification by him thereof.

All things considered, we are obliged to conclude that the district court of Niobrara County was correct in its judgment rendered to the effect stated above, and it is accordingly affirmed.

*Affirmed.*

KIMBALL and BLUME, JJ., concur.