(October Term, 1941)

# WESTERN AUTO TRANSPORTS, INC. v. CITY OF CHEYENNE ET AL.

(No. 2203; November 12, 1941; 118 Pac. (2d) 761)

352

For the appellant, there were briefs by *Milton R. Foe* of Manderson, Wyoming, and *Truman A. Stockton, Jr.* of Denver, Colorado, and *George F. Guy* of Cheyenne, Wyoming, and oral arguments by *Messrs. Stockton* and *Guy*.

For the respondents, there were briefs and oral arguments by *C. A. Lathrop* of Cheyenne, Wyoming, and *Amos Mathews* of Chicago, Illinois.

358

BLUME, Justice.

This action is brought to enjoin the City of Cheyenne from enforcing an ordinance passed in June, 1935, and which, without reciting its title or its concluding parts, is as follows:  .

"SECTION 1. For the purpose of this Ordinance, a Motor Caravan transporting automobiles through the City of Cheyenne shall be defined as any group of cars or trucks trailing or carrying new or second-hand automobiles to a destination outside of the City of Cheyenne and passing over the streets of said City. A group of cars or trucks is defined as one or more of such vehicles trailing or carrying new or second-hand automobiles destined for points outside of the City of Cheyenne.

SECTION 2. It shall be unlawful for any caravan, as defined in this Act, to pass over the streets of Cheyenne without first obtaining from the Chief of Police a permit as provided herein. Such permits shall be of two classes, and issued to cover the expense of regulation, control and supervision of said caravans.

A permit allowing the use of the streets of the City, without parking privileges, shall be issued to the manager, driver, or other chief officer of the caravan, designating the number of vehicles in said Caravan, the license number of the automobile operated by the officer or driver in charge of the caravan, a description of the automobiles being towed, towing or being transported, and the period of stay in the City of Cheyenne. Such permits shall be issued at a charge of $1.00 for each automobile so transported.

A permit granted to such caravan parking privileges shall be issued in like manner, by the Chief of Police, incorporating all the information required by a permit which does not grant parking privileges. In addition thereto, the Chief of Police shall designate what area shall be occupied by the caravan, and extend it to parking privileges in periods of twelve (12) hours duration. The charge for such permits shall be $2.00 for each car being towed, towing or being transported, for such period of twelve hours. No permit shall include a charge for the motor vehicle occupied or driven by the manager or other chief officer of the caravan, provided such motor vehicle is his personal property and not being moved through the City of Cheyenne for the purpose of sale.

SECTION 3. Upon the issuance of a permit, the Chief of Police shall assign to the holder of the permit an officer of the Cheyenne Police force, for the purpose of escorting the caravan through the City; extending such

courtesies and assistance as may be necessary to insure the safe conduct of the caravan beyond the City limits. The Police officer shall be in complete charge of the entire caravan during the period of transit, and is hereby directed to take such precautions as may be necessary to insure the safety of the public. Any caravan parked in a designated area, after the hours of darkness, shall be suitably marked as may be directed by the police officer in charge. The minimum required shall be parking lights on the first and last cars of the caravan, after the hours of darkness, and lights of a suitable nature along the street side of the parking area every fifty (50) feet.

SECTION 4. This ordinance is enacted for the protection of the public health and safety, and for the protection of the citizens of the City of Cheyenne in the use and enjoyment of its thoroughfares.

SECTION 5. Any person, firm or corporation violating any of the provisions of this ordinance shall be deemed guilty of a misdemeanor and fined not to exceed one hundred dollars for each offense. A violation on different days shall constitute a separate offense."

It appears herein that plaintiff is a corporation organized under the laws of Illinois, with its principal place of business in Denver, Colorado; that it is engaged solely in the business of interstate transportation of new automobiles from points east of Wyoming to points west of this state, and has a permit from the Interstate Commerce Commission; that it uses for such transportation trucks and trailers attached, capable of hauling four automobiles at one time; that two of these automobiles are loaded onto the trailer, and two more on top of the others; that the wheels of none of the automobiles are on the ground and none of them are towed. Plaintiff comes within the legislation of the state regarding motor vehicles, and is subject to the regulations of the Public Service Commission. But, notwithstanding the fact that our statutes have special provisions relating to towed vehicles, that commission, according to the testimony in this case, classifies plaintiff's operation as a common trucking operation. Four

chains are attached to each automobile, one on each corner of the frame, and all are fastened to the trailer, so that there are 16 chains to each trailer. Four chains are attached to each automobile, so that if one of the chains should happen to break, it will still be safely fastened to the trailer by reason of the others. The load is no higher than permitted under regulations of the state. The truck and trailer are 42 feet long, shorter than many other trucks and trailers. The total length allowed under the laws of the state is 45 feet. Other testimony will be mentioned hereafter. Plaintiff in its petition alleged that the ordinance is not regulatory, but is designed for revenue purposes, and is arbitrary and confiscatory; that it is an undue burden on interstate commerce and in violation of Article 1, Section 8 of the Constitution of the United States; that it is also in violation of certain provisions of the Constitution of the state.

■ The plaintiff contends that its operations do not come within the contemplation of the ordinance in question because of the fact that it is substantially a trucking operation and not a towing as contemplated in the ordinance. We think the point was fairly raised by the petition. The ordinance was before us, though on the pleadings only, in the case of Kenosha Auto Transportation Company v. Cheyenne, 55 Wyo. 298, 100 P. (2d) 109. That case is in no way controlling herein. There was some doubt in our minds as to whether or not the vehicles there under consideration were such as to come within the contemplation of the ordinance. But some of the automobiles were towed. None of them are towed by the plaintiff. The Kenosha case was decided in the light of the decisions dealing with caravans, and in the light of the legislation on the subject in our state and in other states. Our legislation did not specifically mention caravans. But caravans were made up of vehicles which were towed, so that

provisions dealing with towed vehicles were, in the light of the then conditions, evidently deemed the equivalent of provisions dealing with caravans. In subd. (r) of Sec. 2, Ch. 65 of the Session Laws of 1935, operators of towing motor vehicles were defined as "every operator of a motor vehicle towing a motor vehicle or vehicles coming into or going through the state on any highway for the purpose of sale, barter or exchange within or without the state of such towed motor vehicle or vehicles." To make the provision more specific, subd. (r) of Sec. 1, Ch. 121, Session Laws of 1937 defined such operators as "every owner or operator of any motor vehicle being driven or towed over the highways of this state *on its own wheels*, for the purpose of sale, barter or exchange within or without this state or for delivery after sale or storage prior to sale." See also Ch. 70, Session Laws 1941.

Counsel for the city contend that the vehicles of plaintiff come within the terms of the ordinance since Section 1 thereof relates to trucks "trailing *or* carrying" automobiles. Technically speaking that is correct. But that it is not necessarily controlling since the word "or" may be construed in a conjunctive or copulative sense when so doing prevents an unreasonable result. 46 C. J. 1126. If a truck should carry one or more automobiles completely enclosed on all sides, such operation would, of course, fall within the meaning of "carrying" used in the ordinance, if "or" is used in a disjunctive sense. We can hardly believe that counsel for the city would contend that the ordinance would be valid as applied to such an operation, based, as it would be, merely on the character of freight carried, or that the ordinance contemplated or intended to embrace such an operation. Hence to interpret "or" in a disjunctive sense would lead to an unreasonable result, and we must reject such construction and use the term in a conjunctive sense. And that construction, and that

only, is in harmony with the provisions of the ordinance as a whole. The title of the ordinance reads: "An ordinance providing for the regulation and supervision of motor caravans towed, towing and transporting automobiles through the City of Cheyenne, Wyoming." This title indicates not alone that it was intended to regulate "caravans," but specifically referred to "towing, towed *and* transporting" automobiles. When the ordinance was enacted, long caravans were continually passing through Cheyenne toward the western coast. Many cars were attached to each other, all of them having their wheels on the ground. In Morf v. Ingels, 14 Fed. Supp. 922, 1025 (1936) the court stated that the term "caravan" has come to mean "a considerable number of persons journeying in company by several or many vehicles. Fleet movement of cars may be termed caravans." The Kenosha case referred to that definition and was decided on the theory that the vehicles considered in that case bore at least a resemblance to caravans as thus defined, and it is at least a serious question, since we discussed the point at some length, as to whether or not the decision in that case would have been what it was, if it had not been for that fact. It can scarcely be doubted that when the city council of Cheyenne enacted the ordinance in question it had in mind the conditions then existing, and the legislation in this state and other states, particularly New Mexico and California, relating to caravans and towed vehicles, and did not have in mind automobiles which were loaded on a truck and trailer as are the automobiles of the plaintiff in this case. And this conclusion is clearly borne out by the provisions of Section 3 of the ordinance. An officer was to be assigned "for the purpose of escorting the caravan through the city, extending such courtesies and assistance as may be necessary to insure the safe conduct of the caravan beyond the city limits." And

the police officer was required to be in complete charge of the entire caravan during the period of transit. There is nothing in the record indicating that this would be necessary with the vehicles used by plaintiff. The contrary is true. The minimum illumination at night required by the ordinance, in case the caravan should be parked "shall be parking light on the *first* and the *last* cars of the caravan," clearly showing that no motor vehicles like those used by plaintiff were contemplated, for plaintiff uses but one which has its wheels on the ground—a truck and trailer. Lights of a suitable nature were required, if parked at night, "along the street side of the parking area every 50 feet." The vehicle of plaintiff is only 42 feet long, and the ordinance seems to have contemplated caravans several times 50 feet in length, otherwise a simple requirement of a light in front and in the rear would have been sufficient. It may be observed in this connection that the permits issued to plaintiff are on a certain form entitled "Automobile Caravan Permit." While it is not certain, it is altogether probable that this form has been used from the beginning, clearly showing the intention at the time when the ordinance was passed. It is true that if a statute or an ordinance is broad enough, it will at times be extended to include conditions not in existence and not contemplated at the time of its enactment. 59 C. J. 973-974; Pellis Bros. v. Cooper, 47 Wyo. 480, 38 P. (2d) 607; Equitable Life Ass'n. v. Thulemeyer, 49 Wyo. 63, 52 P. (2d) 1223, 54 P. (2d) 897. But where "the statute (or ordinance) shows plainly that the word is not used as describing the whole genus put forward as the one applicable to the case, but only some particular species thereof, the rule has no application." 59 C. J. 974. In this case, it plainly appears that the ordinance was intended merely to apply to a particular species of motor vehicles under particular conditions. We should give a reasonable

construction to the ordinance. And, read in the light of the conditions prevailing at the time of its enactment, the legislation then existing, the decisions of the courts, and the well known meaning of "caravan," it would, we think, be unreasonable to say that the ordinance applies to the vehicles used by the plaintiff.

■ It is further contended that the fees charged by the city under the ordinance are excessive as to the plaintiff and therefore void. We think we should decide this point, lest it be thought that the decision herein rests on purely formal grounds which might be easily remedied by the enactment of a new ordinance. The record discloses substantially the following facts: From February 1, 1939, to December 1, 1940, the plaintiff paid to the city $2420.00, which is at the rate of nearly $4.00 per day, $110 per month, or at the annual rate of $1320.00, and shows that one of plaintiff's vehicles passed through the city on the average of six to seven times a week. There is testimony in the record that the amount of transportation has increased since that time, so that the number of trips and the amount paid may now be larger.

Plaintiff's drivers stop in the city only for sufficient time to eat. When plaintiff first began its operation it failed to pay the fees provided by the ordinance, and its drivers were brought back into the city three different times, but the testimony indicates that this was done merely for the purpose of collecting the fees and cannot be taken into consideration in determining the reasonableness of the fees. Prior to about September, 1940, it was necessary for plaintiff in going westward to drive through a viaduct under the Colorado & Southern Railroad, located about a quarter or half of a mile west of the city. Because of the height of the load, difficulties were encountered in passing through it, and the traffic officer of the city aided the drivers a number of times. But a different underpass had been con-

structed since that time, so that such service is no longer necessary. Since the time when plaintiff has been advised of the existence of the ordinance, its drivers notify the police department of their arrival in the city and the place where they stop, and thereupon an officer is sent to collect the fees. According to the record the latter has a few times examined plaintiff's load and climbed on top to examine it for safety, but never found anything out of order. Generally the traffic officer when collecting the fee has not examined the vehicle with its load or looked at it. New drivers of plaintiff have, according to the testimony of a police officer, frequently been told by him how to get out of the city and he has a few times escorted them on the way out. Five of plaintiff's drivers testified that they never were escorted out of the city. The main trouble given by plaintiff's drivers, according to defendants' testimony, has been by reason of "double-parking," though that has been true with others, and the traffic officer supervises other trucks and vehicles as well as those of plaintiff. Most of the commercial trucks do not pass through the congested business district, but the plaintiff's trucks do, and except for that fact, the plaintiff's operation would give no greater trouble than the operation of other trucks, for which no special fees are exacted, unless a unit on the load should happen to come loose as mentioned below.

On the question of safety, the testimony, aside from that already mentioned, is substantially as follows: The loads carried by plaintiff are accompanied by two drivers, and they are instructed to examine the chains each time they stop. Plaintiff has never had an accident by reason of the method of loading. The witness Hall, president of the plaintiff company, testified that its trucks and trailers do not differ materially from other trucks and trailers. The witness Marrow, a transportation engineer, and Chairman of the Safety

Committee of the American Trucking Association, was asked the following question: "Is there any unusual fact or feature which would present a special traffic hazard or danger, or which would necessitate special regulation of automobile transport trailers, as compared with trailers used to transport any other type of cargo?" He answered: "I would say to this: Most emphatically NO in answer to that question. This particular type of equipment does not create any hazard, in my opinion. My reason for saying that is that I believe if there were to be any comparison between this type of equipment and the other types of equipment that I am familiar with on the streets and highways today, that this would be a safer unit." The only testimony of the city bearing on that point is that the load has been seen a few times to sway somewhat from side to side in a high wind, but the chains had never been seen to come loose. The chief of police, after much hesitation, testified that the plaintiff's vehicles need supervision when none of the others do for this reason: "They have two units on the top runway of that transport, and each of those units weigh from 3500 to 4000 pounds. Should any one of those units get loose and come off the top of that runway, it would cause a more serious accident than two cars crashing together at an intersection." "Q. Yes, you are surmising, of course. None of them ever have, have they? A. No, but you can't tell when one of them will have it."

It is not improbable that when the city council fixed the fees in the ordinance in question, it had in mind the then existing legislative acts of New Mexico and California. In New Mexico the fee for each vehicle which was towed was fixed at $5.00 and in California as high as $15.00. See Ingels v. Morf, 300 U. S. 290, 57 Sup. Ct. 439, 81 L. Ed. 653. However, in determining whether a regulatory fee is excessive, the particular facts of each case are controlling. North Star Line v.

Grand Rapids, 259 Mich. 654, 244 N. W. 192; 37 C. J. 194. And it is scarcely reasonable to take the fees fixed for a whole state as a model even on a somewhat smaller scale for fees to be paid in a community with the population of Cheyenne. The fee fixed in the ordinance is claimed to be a regulatory fee, under the police power, not a tax, and the city does not claim the right to tax. Such fee, to be lawful, if within the power of the municipality to exact under the laws of the state, and if laws of Congress do not forbid, though no nicety in calculation is required, should be imposed for the purpose of defraying the expenses incidental to regulation, supervision and enforcement, and should be approximately confined to and commensurate with such expenses. 33 Am. Jur. 367, 37 C. J. 193, 194; Clark v. Paul Gray, 306 U. S. 583, 59 Sup. Ct. 744, 83 L. Ed. 736; McQuillan, Mun. Corp. Sec. 1102. The presumption is that the fees are reasonable (33 Am. Jur. 368), and will be so held by the courts, unless the contrary appears on the face of the ordinance or by testimony introduced in the case. Towns v. Sioux City, 214 Iowa 76, 241 N. W. 658. And in determining the reasonableness of the fees fixed by an ordinance, courts take into consideration the laws of the state covering the same general field of legislation, if they do not entirely supercede the local regulations, for the less regulation is necessary the less justification for the exaction of fees. North Star Line v. Grand Rapids, supra. It is the duty of the Public Service Commission or the State Highway Department to supervise and regulate the operations of all motor carriers, including interstate motor carriers. Section 3, 8, 11 and 14, Ch. 121, Session Laws of 1937. The superintendent of the Highway Department may, under Section 74, Ch. 126, Session Laws of 1939, require the driver of a motor vehicle, at any time, upon reasonable cause, to submit to inspection of his vehicle and require whatever may be necessary to put

it in safe condition and he may designate any police officer to act in his stead. Under Section 73 of the same legislative act, he may order the suspension of the registration of any vehicle which he determines is in an unsafe condition. Furthermore, the State has a Highway Patrol, whose duties it is to "enforce all the motor vehicle laws of this state." It consists of a captain and a sufficient number of patrolmen to carry out the purposes of the legislative act. Chapter 89, Session Laws 1937. The sum of $200,000, or so much thereof as is necessary was appropriated for the use of the patrol by Ch. 128, Session Laws of 1941. Some illustrative decisions help us in solving the question before us. In Ex parte Fine, 124 Or. 175, 264 Pac. 317, an ordinance exacted the sum of $120 annually from wholesale trade vehicles operated in the city. The court, without any evidence before it, held that "in our opinion the license of $120 a year is far beyond an amount requisite for the purpose of regulating the use of the streets by wholesale trade vehicles, including the expense of issuing the license." In Sperling v. Valentine, 28 N. Y. S. (2d) 788, a local law provided for the licensing of itinerant jobbers of foodstuffs in the city, imposing an annual license fee of $100 to $250 for each vehicle used by such jobbers. The court, without evidence before it, held the charge too excessive and the ordinance void. In Root v. Mizell, 95 Fla. 979, 117 So. 380, an ordinance exacted $25 per month, or $300 a year, for the inspection of a dairy five miles beyond the city, while charging no fees for inspection for dairies within the 5-mile limit. The ordinance was held to be unreasonable. In North Star Line v. Grand Rapids, supra, a city ordinance required an applicant for a license from the city to operate an interurban bus to pay an annual fee of $15. The court held the fee to be excessive, and stated, among other things:

"In this connection it must be borne in mind that

each of these interurban bus routes passes through numerous villages and townships and enters and passes through one or more cities other than Grand Rapids. Each of these municipalities has the same constitutional right as Grand Rapids to the reasonable control of their streets, alleys and public places. Anything like unrestricted license fees imposed by each of such municipalities would render the operation of interurban busses impossible. * * * It is self-evident that if there is little or no need for supervision or regulation in addition to that effected by the state and if the city streets are not subjected to an additional burden by interurban bus traffic, the justification for requiring a license at all is meager to say the least."

In that case testimony was introduced to show the number of commercial vehicles in the city as well as the total number of vehicles, showing that the interurban busses constituted only a small portion of the total. We do not have such evidence before us. There is testimony, however, that the main trouble given by plaintiff's vehicles is double parking, and hindering other vehicles from leaving the curb along which they are parked. This has some tendency to show that the business district in the city is crowded with vehicles. The testimony further shows that other trucks are supervised by the traffic officers and give the same trouble. This shows that at best the trouble given by the plaintiff's vehicles is but a part of the trouble given to the traffic officers, and that trouble has not been given by reason of the peculiar character of load, differing from loads on other trucks and trailers in connection with which no fees are exacted. True, the city attempted to justify the charge of the fees partially on the ground that inspection of its vehicles is perhaps necessary. Many cases hold that when the state has occupied a field of regulation, an ordinance must give way. See e.g. Bay Cities Transit Co. v. Los Angeles, 16 Cal. (2d) 772, 108 P. (2d) 435. But it is not necessary to decide herein whether notwithstanding that,

the city, too, may not require inspection. The ordinance does not provide for inspection. It gives no power to the officers except to escort them through the city, and assign a parking place. If, however, it implies that the vehicles may be inspected, it is readily seen, under the testimony of this case, that the need for it is limited. The chains have never come loose, and were never seen to come loose by the officials of the city. They "might" come loose, as the chief of police testified. But the state has provided for inspection, and in fact may appoint the traffic officers in Cheyenne to act as its agent, in which event no fees are charged. Furthermore, the plaintiff's testimony shows not alone that its drivers inspect the chains from time to time, but also that the load carried by plaintiff is at least as safe as the loads of other trucks and trailers. We think that the plaintiff made a prima facie case to show that the fees exacted as to plaintiff are excessive and that the ordinance is void on that account, as to it.

We should mention the fact that after oral argument and submission of this case our attention was called to section 72-121 Rev. St. 1931, providing that municipalities cannot make any charge for the free use of the street. That section was not called to our attention in the Kenosha case. Counsel for the city, in a supplemental brief, claim that it was repealed by section 72-103, passed in 1929. It is not necessary to pass upon the effect of these sections, and we do not do so, particularly since full argument has not been had thereon. Nor is it necessary to decide other points raised herein.

The judgment of the trial court is reversed with direction to enjoin the city from the further enforcement of the ordinance as to plaintiff, and for further proceedings, if any, not inconsistent herewith.

*Reversed with directions.*

RINER, Ch. J., and KIMBALL, J., concur.

ON PETITION FOR REHEARING

BLUME, Justice.

The City of Cheyenne has filed a petition for rehearing herein, and claims, in the first place, that since we construed the term "or" used in the first section of the ordinance in a conjunctive sense, the ordinance in question does not cover operations when the vehicles are only trailed. We used the argument relating to the conjunctive or disjunctive sense of the term "or" only as one of a number of arguments to show that under the particular conditions shown in this case, a disjunctive sense would not lead to a just result and would be out of harmony with the remainder of the ordinance as applied to the vehicles in question in this case. But even if the construction put upon the term "or" should be held to be true in all cases under the ordinance, the result claimed by counsel would not necessarily follow. It could only follow if a too technical meaning is given to the term "carrying." It is altogether probable that the terms "trailing" and "carrying" as used in the ordinance were used for the purpose of arriving at one result—to describe a caravan—and both words were used so that vehicles actually making up a caravan would come within the ordinance whether the term "trailing" or "carrying" would, if construed too technically, apply or not. The word "trail" has been defined as "to be drawn along." 63 C. J. 763. The term "carry" has been defined as being synonymous with the term "transporting." 10 C. J. 1240. If a caravan were made up of automobiles, all of which are "trailed," it would not at all be unreasonable to hold that in such case the word "carry" or "carrying" should be construed as substantially synonymous with the term "trail" or "trailing." The automobiles would be transported and drawn along. It is further contended that since our statutes governing Cheyenne do not require an ordinance to have a title, the title is not controlling. That

may be conceded, but we see no reason why it may not be taken into consideration in determining the meaning of the ordinance as a whole, just as in the recent case of Minnelusa Oil Corp. v. Delarm, 56 Wyo. 464, 111 P. (2d) 107, we referred to the title of a contract in order to arrive at the meaning of the contract as a whole.

The city further contends that the second part of our opinion, which deals with the reasonableness of the fee exacted by the city, is wrong; that the city has the power to prohibit the vehicles of the plaintiff from entering the city, and that, accordingly, the amount of the fee cannot be questioned. We are somewhat surprised that this should be made a ground for the petition for rehearing. We called the attention of counsel in the case to Section 72-121, Rev. St. 1931, which, with a few limitations not applicable here, prohibits municipalities from exacting any fee from motor vehicles for the use of its streets. That section, if in force, of course effactually disposes of the contention here made. But counsel filed a supplementary brief, in which it was claimed that the section mentioned was repealed by Section 72-103, Rev. St. 1931. That section merely provides, impliedly, for "regulatory fees" chargeable by a municipality. We accordingly assumed that counsel had abandoned their claim that the city could charge a "prohibitory fee"; we could not see how they could do any less than that; and we were led to state in the original opinion that the fee "fixed in the ordinance is claimed to be a regulatory fee, under the police power, not a tax," and since such fee must be reasonable, we proceeded to consider that feature. Furthermore, this case involves interstate commerce, and it has been held by the Supreme Court of the United States that if, in such case, the fee exacted is merely a regulatory fee, it must be reasonable in amount, and not disproportionate to the expense involved. Ingels v.

Morf, 300 U. S. 290, 57 Sup. Ct. 439, 81 L. Ed. 653;
see also Sprout v. South Bend, 277 U. S. 163, 48 S. Ct.
504, 72 L. Ed. 833; Clark v. Paul Gray, 306 U. S. 583,
59 S. Ct. 744, 83 L. Ed. 1001, and Interstate Busses
Corp. v. Blodgett, 276 U. S. 245, 48 S. Ct. 230, 72 L.
Ed. 551, 62 A. L. R. 45. We accordingly saw no escape
from treating the subject of fees in that light. Nor do
we think that these decisions have in any way been
modified by more recent decisions.

The city claims that the power to prohibit includes
the power to make a regulation so oppressive that it
may amount to prohibition, and that hence inquiry into
the reasonableness of the fee exacted by the City of
Cheyenne under the ordinance here involved cannot be
made. The rule mentioned has been announced in a
number of cases. 33 Am. Jur. 368; Peoples Taxicab
Co. v. Wichita, 140 Kans. 129, 34 P. (2d) 545; 96 A. L.
R. 1218; Ex parte Sterling (Tex.) 53 S. W. (2d) 294;
St. Louis Poster Advertising Co. v. St. Louis, 249 U. S.
269, 39 S. Ct. 274. In the last mentioned case the court
stated that "if the city desired to discourage bill-boards
by a high tax we know of nothing to hinder, even apart
from the right to prohibit them altogether." We may
admit the correctness of the rule. Whether it has any
application in the case at bar is another question. The
city claims that it is applicable in view of Maurer v.
Hamilton, 309 U. S. 598, 84 L. Ed. 969, 60 S. Ct. 726
and Pennsylvania-Detroit Lines v. Simpson, 37 Fed.
Supp. 314, affirmed by the Supreme Court of the United
States in 312 U. S. 655, 61 S. Ct. 622, 85 L. Ed. 1104.
The latter case involved a law of the state of West
Virginia, which prohibited the use of highways by
vehicles having two levels for the carriage of other
vehicles. The former of these cases involved a some-
what similar law of Pennsylvania. The city contends
that if the state may pass such a valid law, the city of
Cheyenne has the power to enact an ordinance to that

effect. We might say in passing that the city has not by the ordinance here involved undertaken to legislate on vehicles with two levels, and the contention herein made would not be good for that reason alone. We shall, however, consider the contention from a broader standpoint, and show that it is wholly without foundation for a number of reasons.

I. In the first place, it must be obvious that the contention that the city of Cheyenne, and hence every other city and town along the Lincoln Highway and along all other highways crossing the state, should have the power to effectually block and stop all intrastate as well as interstate traffic, is not one which would appeal to a court in the absence of specific legislation authorizing it. That was pointed out in North Star Line v. Grand Rapids, 259 Mich. 654, 244 N. W. 195, cited in our original opinion. Other cases are to a like effect. In Cary v. North Plainfield, 49 N. J. L. 110, 7 Atl. 42, the court considered a law which would permit that, to be absurd. The court stated:

"The inconvenience attendant upon the exercise, by every municipality in the state, of the power of excluding from its limits all unlicensed vehicles engaged in transporting goods or passengers for hire, is manifest. Its legitimate operation would require the owners of such vehicles to obtain licenses not only from the authorities of the place where their business had its headquarters, but also from every neighboring town into which their casual engagements might call them, or else to unload their vehicles at the border line. A general law having effects so burdensome or so absurd is not to be anticipated, and only unequivocal language could convince a court that such legislation was intended."

The court in White Oak Coal Co. v. Manchester, 109 Va. 749, 64 S. E. 944, 132 Am. St. Rep. 943, took a similar position, stating:

"It is generally regarded as a reasonable exercise of such charter powers to lay a license tax upon vehicles

of residents of the municipality, and upon persons residing outside of the corporate limits who employ their vehicles in furtherance of business and occupations carried on within the city. But to levy such tax on vehicles of non-residents, whose business or pleasure casually carries them into or through the city, would be in derogation of their reserved right to use the highways of the Commonwealth and impose intolerable conditions upon the public, and lead to absurd results. As corrollary to these well settled rules, the grant by the legislature of municipal control over streets must be construed strictly in the interest of common right."

The Supreme Court of Illinois in City of Lincoln v. Dehner, 268 Ill. 175, 108 N. E. 991, stated among other things:

"If the owner or driver of a motor car such as that owned by appellee could be held up and made to pay a license fee or tax by the authorities of every city, town or village he visited or passed through, it would be impossible for anyone to use or operate a motor car for the purposes for which it was purchased or intended and ordinarily used. In any event, such ordinances, under present conditions as shown by the evidence would be so unreasonable that they would prohibit the natural and practical use of automobiles. Whatever the legislature intended or meant, it was never intended to permit such condition of affairs."

II. The position of the City of Cheyenne, claiming the same power as that possessed by the sovereign state, is rather extraordinary. It has often been asserted that the Legislature has supreme power over its highways and may regulate or entirely prohibit the use thereof by carriers, though that power has never been applied except in a limited manner. See notes, 87 A. L. R. 735, 81 A. L. R. 1415, 56 A. L. R. 1056. We assume that the absolute power, if it exists to the full extent claimed, is limited to intrastate traffic. Stephenson v. Binford, 53 F. (2d) 509, 514; Buck v. Kuykendall, 267 U. S. 307, 45 S. Ct. 324; George W. Bush & Sons v. Maloy, 267 U. S. 317, 45 S. Ct. 327;

Interstate Transit Co. v. Lindsey, 283 U. S. 183, 51 S. Ct. 380; 75 L. Ed. 953; Blashfield, Ency. Auto. Law, (Perm. Ed.) Sec. 54. The state, however, has the power, even as to interstate commerce, to make reasonable regulations, and so the prohibition to haul vehicles with double decks, as above noted, has been upheld. But merely because the state has such power, it by no means follows that the City of Cheyenne has it also. Municipalities occupy a much more humble position in this state than counsel for the city is willing to admit. They are the creatures of the legislature. 43 C. J. 68. They have only such powers as have been granted by the state. 43 C. J. 176. Streets in municipalities are part of the highways of the state. 44 C. J. 882, 926, and the legislature has the primary power to control and regulate them. It may delegate the power of control and regulation of streets to local authorities, but may re-assume the power delegated. 29 C. J. 646, 44 C. J. 925, 926, 929. We must, accordingly, inquire what powers have been delegated, and for the present, we shall only consider the charter powers of the City of Cheyenne, referring to restrictions thereon later on in this opinion. The power and control over streets is rather limited. Section 22-1918, Rev. St. 1931, subd. 3, grants the power to "levy and collect taxes on * * * drays, hacks, carriages, omnibuses, carts, wagons and other vehicles used in the city for pay * * * and regulate the same by ordinance," etc. We shall again refer to this provision presently. Subdivision 23 of the same section gives the city the power to "prevent and punish horseracing, fast driving or riding in the streets, highways, alleys, bridges or places in the city," etc. This has no application in the case at bar. Subdivision 24 of the same section gives the city the power "to make all such ordinances, by-laws, rules, regulations, resolutions, not inconsistent with the laws of the state, as may be expedient in addition to the special powers in

this section granted, maintaining the peace, good government and welfare of the city and its trade, commerce and manufactures," etc. Similar provisions are contained in Section 22-1917, Rev. St. 1931. We find no general power to regulate the use of the streets, let alone the power to prohibit the use thereof. In Kenosha Auto Transport v. Cheyenne, 55 Wyo. 298, 100 P. (2d) 109, we made reference to the general welfare clause. In that case, however, the question of regulation, not the question to tax or to prohibit, was involved. While the general welfare clause has often been construed broadly (McQuillan, Munic. Corp. Rev. Ed. Sec. 950), we have found no case, and none have been cited to us, upholding the power to tax or to prohibit under such a clause. The contrary has been held under power much more comprehensive than that granted to the City of Cheyenne. In Bogue v. Bennett, 156 Ind. 478, 60 N. E. 143, the city was given the exclusive power over the streets, highways, alleys and bridges within its borders. Its charter also contained a general welfare clause, similar to the one above mentioned. It undertook to prohibit traction engines on the streets. The court denied the right even under the express clause above mentioned giving exclusive rights over the streets. And referring to the general welfare clause, the court, among other things, stated:

"The provisions * * * give no authority to pass an ordinance prohibiting the running on the streets and alleys of said city of all vehicles propelled by steam. That clause only grants authority to regulate the vehicles described, when used for purposes mentioned therein. There is no statute to which our attention has been called, and we know of none, which in express words, confers upon the common council of cities the power to pass an ordinance prohibiting the running upon the streets and alleys of vehicles propelled by steam. It is not necessary, therefore, to decide as to the power of the legislature to grant such authority to municipal corporations * * * A highway is a public

way for the use of the public in general, for passage and traffic without distinction * * *. Incorporated cities and towns in this state have the power to regulate public travel upon the streets * * * and may have the power to prohibit the use of certain streets for certain purposes and by certain classes of vehicles; yet it is evident that they have no authority, under their implied powers, or under the general grant of power over the streets and alleys, to prohibit traction engines and other vehicles * * * from using all the streets."

It has often been asserted that the power to prohibit exists when a special use is sought to be made of the streets. 44 C. J. 931. The absolute right thus claimed has seldom, if ever, been exercised. The claim has frequently been made in connection with the regulation of jitneys. In some of the cases this absolute right has been denied. See Commonwealth v. Stodder, 2 Cush. (Mass.) 563. The Supreme Court of Pennsylvania, in Jitney Bus Ass'n. v. Wilkes-barre, 256 Pa. 462, 100 Atl. 954, stated as follows:

"As to the right of the municipality to regulate, in the interest of public safety, the running of jitneys, as well as all other traffic upon the public streets, we have no doubt. The only question in such case is whether the requirements of an ordinance for that purpose are reasonable, and not unduly burdensome. Regulation is not to be carried to the extent of prohibition. A jitney is an automobile, and by universal custom automobiles are permitted to use the streets of cities, as are other vehicles. The fact that the owners of jitneys derive a profit from their operation, makes no difference in their legal status. Much of the traffic upon the city streets is a matter of profit, directly or indirectly to those engaged therein. The public highways are for the use of those engaged in commerce or industrial pursuits, no less than for pleasure cars."

In Dent v. Oregon City, 106 Or. 122, 211 Pac. 909, it appears that plaintiff was a common carrier operating between Portland and Salem. Oregon City evidently lies between these two points. It passed an ordinance

prohibiting any common carrier on its streets without obtaining a franchise from the city. The court held the ordinance invalid, and in the course of its discussion stated as follows:

"The right to use the public highways of the state by the ordinary and usual means of transportation is common to all members of the public without distinction, and extends to those engaged in the business of carrying passengers or freight for hire by such ordinary and usual means of transportation, as well as by individuals pursuing a strictly private business, subject to the power of the state, by legislative enactment, to impose reasonable and impartial regulations upon such use, which power may be delegated by the Legislature to the governing bodies of municipal corporations. * * * The foregoing charter provisions empowered Oregon City to impose reasonable regulations upon those using its streets, adopted in view of the local conditions and requirements respecting the streets, the travel, and the public safety. Those regulations cannot be carried to the extent of prohibition where the use made of the streets is strictly for travel and passage by the usual and ordinary means, but where the use made of the streets results in an occupancy or appropriation of the streets, or any portion thereof, for private purposes beyond that involved in traveling upon such streets by the usual and ordinary means, the municipality may not only regulate, but it may prohibit that special or peculiar use of its highways. * *·* (citing cases). Some of the cases last cited contain statements to the effect that a municipality having power to regulate the use of its streets may entirely prohibit those engaged in the carriage of passengers or property for hire from using the streets within its boundaries for carrying on their business. That is true when the streets are used by such carriers as a stand for transacting business or soliciting patronage, stopping to let off or take on passengers, or any other use by which the streets, or a portion thereof, are occupied or appropriated to the exclusion of the remainder of the public, or are used in a manner that produces excessive wear upon the highways or endangers the public safety or which interferes with or obstructs the use of the streets as highways for the purpose of business or travel; but the

statements are inaccurate as applied to the use of such streets by common carriers strictly as thoroughfares. A common carrier of passengers or freight by means of vehicles in ordinary use has an equal right with all other citizens to use the public highways for purposes of traffic and passage, subject to reasonable regulations, and the exercise of that right cannot be entirely prohibited without express legislative authority, and then only in exceptional circumstances."

The first part of this quotation was accepted as stating the law in Omaha & Council Bluffs Street Ry. Co. v. Omaha, 114 Nebr. 483, 208 N. W. 123. See also State v. Gish, 168 Iowa 70, 150 N. W. 37. But whatever may be the right of the city when it comes to purely local matters, it would seem, as already indicated, that the absolute power which is at times claimed cannot exist in connection with vehicles engaged solely in interstate commerce.

Ordinances of the city relating to motor vehicles must not be in conflict with the laws of the state. 42 C. J. 618; 5 Am. Jur. 557. The plaintiff in this case has been licensed under these laws and in addition pays the tax for the use of the highways. It is permitted by the state to run over these highways. That is inconsistent with the power of the city to prohibit their use. In Walker v. Comm., 40 Pa. Super. Ct. 638, the court held that a grant of a right to use the highways of the state under license by the state deprives local authorities of the power to prohibit the use thereof in the locality. In Sumner County v. Interurban Transportation Company, 141 Tenn. 493, 213 S. W. 412, 5 A. L. R. 765, the county court undertook to restrict the size and weight of vehicles using the public highways in the county, similar to the power claimed in the case at bar. The court denied the power. The court said in part:

"A public road is a way open to all the people, without distinction, for passage and repassage at their pleasure. * * * * This being the established nature of a public road, the county court would have no power to

exclude any members of the public from its reasonable use without legislative authority. So far as we are advised, the legislature not only has not forbidden the use of motor vehicles, without regard to weight or load, upon public highways, but has authorized their use by levying a tax upon them. As stated heretofore, the defendant has paid this tax. The legislature, as the constitutional representative of the public, has the power to levy any reasonable condition upon members of the public for their use of the public roads; but the county court, without express authority, has not such power."

In Chicago Motor Coach Co. v. Chicago, 337 Ill. 200, 169 N. E. 22, 66 A. L. R. 834, the question was whether or not the city had the power to prohibit the operation on its streets of motor busses, as common carriers, when the carrier had received a certificate of public convenience and necessity from the state. The court denied the right. To a similar effect is Robbins v. Illinois Power & Light Co., 255 Ill. App. 109. In People v. Marcello, 25 N. Y. S. (2d) 533, 546, the court stated that "a village may not by ordinance prohibit trucks from using a state highway passing through the village," apparently on the ground that this would be inconsistent with the permission of use by the state.

III. As already stated, the city claims the right to charge a fee beyond that necessary to cover the expense of administration. If that is true, then the amount over and above such expense would be a tax, or at least in the nature of a tax. St. Louis Poster Co. v. St. Louis, supra. If the city has the power to exact a tax, then the incidental power to prohibit might exist, if the tax should not be paid. So we shall turn to the power of taxation. The rule already mentioned that the power of a municipality must be found in a statute applies in such case. It is stated in 61 C. J. 84 that "the power of a political subdivision to levy taxes must be expressly and distinctly granted." In 44 C. J. 1262 it is stated that the power to tax "is not possessed by a

municipal corporation unless it has been plainly and unmistakably granted to it either in express terms or by necessary implication." In 37 C. J. 179 we read that "the power of a municipal corporation to impose a license tax for revenue purposes exists only where it is plainly granted." McQuillin on Municipal Corporations, supra, tells us in Section 1087 that since "the power to tax and license as a means of raising revenue is not inherent in municipal corporations, it follows that such power must be expressly conferred in plain terms, or it must arise by necessary implication from powers expressly granted. The exercise of the authority must be within the clear scope of the language of the law conferring the power. Grants of this nature are usually strictly construed against the exercise of the power and in favor of the public."

We find no power to levy a tax upon the vehicles of plaintiff by reason of the wear on the street. If, then, the city has the power to levy a tax, it must be under its power to license. That power does not exist under the general welfare clause. 2 Dillon, Municipal Corporations, (5th ed.) 637. Hence it must exist, if it exists at all, under the power already mentioned to levy and collect a tax upon vehicles "used within the city for pay." The right thus given is in conjunction with the right to levy and collect taxes on auctioneers, druggists, pawnbrokers and other business. It would appear to be an occupation tax. And it is shown in note, 86 A. L. R. 920, that such tax cannot be levied unless the business is carried on within the city, not even with the consent of the legislature. A number of cases have dealt with situations in which a municipality has imposed a license tax upon vehicles engaged in traffic between cities within the state. A note on the subject will be found in 31 A. L. R. 594, and see for further cases State v. Gamelin (Vt.) 13 A. (2d) 204, 208. It is part of the same subject dealt with under the head

of "Extraterritoriality of Licensing Power" in 19 R. C. L. 962. We have already noted the view of the Supreme Court of Virginia in White Oak Coal Company v. Manchester, supra. In Commonwealth v. Stodder, 2 Cush. 562, the city required a license tax for stage coaches entering the city from the outside. The court stated that "as to the requisition of a payment of money, operating as it does as a direct tax upon the vehicles to be used, we can find no authority for this provision of the ordinance. Taxes are to be levied under the provisions of general laws enacted by the legislature. We look in vain for authority for it either in the city charter or the statutes of the commonwealth." The court stated that if the amount were only such as would cover the expense of issuing the license, that might not be objectionable. In Carey v. North Plainfield, 49 N. J. L. 110, 47 Atl. 42, affirmed in 50 N. J. L. 176, 71 Atl. 1103, where the city attempted to collect a license tax on those hauling goods into the city from outside, the court stated:

"But when a power to tax for revenue is claimed, something more than mere temporary presence in the borough must be shown. It must appear that the business to be taxed is carried on in the municipality, and occasional passage or transportation into, through or out of the borough, incidental to the pursuit of a business elsewhere established, cannot fairly be regarded as localizing the business there so as to bring it within the taxing power granted by the statute now in question."

In Bennett v. Birmingham, 31 Pa. St. 15, a borough undertook to collect a license tax from those who carried goods through the borough. The court held that this could not be done. In City of Charles v. Nolle, 51 Mo. 122, 11 Am. R. 440, it appears that the city charter provided that the city should have power to provide for licensing, taxing and regulating hacks, drays, wagons and other vehicles used within the city for pay. It may

be noted that this is substantially the provision contained in the charter of the city of Cheyenne. It was held that the city had no power to impose a license tax upon wagons of outside residents engaged in hauling into and out of the city. The court also stated that if such power had been given, it would be void. In Borough of Gettysburg v. Zeigler, 2 Pa. County R. 326, the town of Gettysburg attempted to impose a license tax upon all vehicles carrying passengers out of the town, including the passengers carried to see the battlefield of Gettysburg. It was held that the town had no such authority; that no specific authority to do so had been conferred; that a general welfare clause confers no such power, and that the power to regulate does not include the power to license. In McDonald v. Paragould, 120 Ark. 226, 179 S. W. 335, it appears that the city had been given the power to enforce rules and regulations affecting motor vehicles used within the city for hire. It was held that this did not include the power to license and tax transportation of passengers between a point inside a city and a point outside. The case was followed in City of Argenta v. Keath, 130 Ark. 334, 197 S. W. 686. In City of East St. Louis v. Bux, 43 Ill. App. 276, the city was given power "to license, tax or regulate hackmen, draymen, omnibus drivers, carters, cabmen, porters, expressmen, and all others pursuing like occupations." It was held that this did not give power to license and tax transportation from a point outside of the city to a depot within it. The case, under a like statutory power, was followed in Cairo v. Adams Express Co., 54 Ill. App. 87. See also Morristown-Madison Auto Bus Co. v. Madison, 85 N. J. L. 59, 88 Atl. 829.

We have examined the authorities which are claimed to hold contrary to the foregoing cases. Even though they may be said to somewhat modify the results claimed in the cases already analyzed, the fundamental

rule therein announced cannot be said to be overturned —that the municipality has no power to exact a license tax when the business taxed is not carried on within it or within the limits within which it may, under statute, exercise its jurisdiction. Comm. v. Beck, 194 Mass. 14; 79 N. E. 744, and Comm. v. Theberge, 231 Mass. 386, 121 N. E. 30, for instance, are clearly distinguishable, in that express legislative authority existed, and further because in these cases only a license for regulation, in the sum of one dollar per annum, was charged, and not a tax for revenue purposes. That too was the situation in Lowe v. Simmons, 185 Miss. 88, 187 So. 214. In most of the other cases cited in note 31, A. L. R. 594 and in State v. Gamelin, supra, the courts relied upon the fact that some substantial part of the business was in fact carried on in the municipality. In Star Transportation Co. v. City of Mason, 195 Ia. 930, 192 N. W. 873, where an interurban bus was held subject to a license tax, the court was careful to point out that "we are not holding in this case that every city or town through which plaintiff's busses pass may impose a tax." In City of Canton v. Electric Ry. Co., 272 Ill. 306, 111 N. E. 1007, the court stated that "so far as the ordinance provides for the payment of a license by every person, company or corporation engaged in the business of operating or running interurban cars for the convenience of passengers or merchandise upon or through any street within the city, the ordinance is unauthorized." In Young and Jones v. Campbellsville, 199 Ky. 284, 250 S. W. 979, the court stated that "of course no mere transient owner of an automobile passing through the town of Campbellsville would be liable for such taxes." And the fact that a municipality cannot exact a license fee or tax from non-residents who merely pass through the city was expressly recognized in W. T. Sistrunk & Co. v. City of Paris, 205 Ky. 835, 266 S. W. 656 and Comm. v.

Kelly, 229 Ky. 722, 17 S. W. (2d) 1017. It would seem to be clear, then, that according to the authorities here cited, the city of Cheyenne would not be warranted in charging a license tax, by way of revenue, and hence prohibitive to that extent, from vehicles merely pass-ing through the city.

This must be so much more true in view of the fact that the plaintiff in this case is solely engaged in inter-state traffic. In People v. Horton Lines, 281 N. Y. 196, 22 N. E. (2d) 338, an ordinance of the city required the licensing of motor vehicles used in the city "for pay." An interstate motor carrier used small trucks to ply between its terminal in New York and the custom-ers, delivering to them the goods hauled in interstate commerce. The lower court had held that this delivery constituted intrastate commerce, for the reason that interstate commerce had ended, and a separate fee was charged for the delivery of the goods, and hence came within the purport of the ordinance. The Court of Appeals reversed the decision, holding that this was not a delivery "for pay," within the meaning of the ordinance, and if it were the ordinance could not con-stitutionally apply to the interstate carrier. In that case the fee imposed was but an annual fee of $5.00 per truck, and hence was distinctly a regulatory fee and not a tax. So in People v. Trucking Co., 277 N. Y. 480, 14 N. E. (2d) 801, vehicles used in the city to deliver goods brought into the city by interstate commerce were held not to be "kept for hire or used * * * for pay." We think that a like rule should be applied to the statute which gives the city the power to regulate and levy a tax upon vehicles used within the city "for pay" as applied to vehicles used in interstate commerce, without, however, deciding as to what purely "regula-tory fee" the city might be able to impose. That point is not necessary to be decided herein.

IV. And finally, if it is not already clear that the

contention of the city herein is not well founded, it will be made so by turning to section 72-103, Rev. St. 1931, which, in so far as pertinent here, provides that "the state registration and county registration fees imposed by this article upon motor vehicles, motor trucks, passenger cars, motorcycles, and trailers, as defined in section 72-101, and upon the owners thereof by reason of such ownership, shall be in lieu of all other taxes, except such fees as may be imposed by municipalities under regulatory ordinances." No fee, accordingly, except at most one which is regulatory, and which, accordingly, must not be disproportionate to the expense involved, may be charged by a municipality upon motor vehicles. We have found some cases which have construed an almost identical statute, and which dispose of every contention made herein. In Parker v. City of Silverton, 109 Or. 298, 220 Pac. 139, 31 A. L. R. 589, the city undertook to exact a license fee from an interurban carrier which had complied with the state laws. The court, citing the statute, held an ordinance requiring the fee invalid, and stated in part as follows:

"The public streets within the limits of an incorporated city or town are a part of the public highways of the state and belong to the whole people of the state. They are maintained primarily for the benefit of the people at large. Persons residing in the city or town have an equal, but not a superior, right to the use of the streets over those who reside elsewhere. All alike must make a reasonable use of them so as not unduly or unreasonably to interfere with the common right possessed equally by all. * * * Plaintiff neither has nor maintains a terminal stage at Silverton, and in order for him to operate in conformity to the ordinance in question in carrying passengers between Salem and Silverton he will be required to pay an annual license fee of $300 per annum for each auto stage used in that connection. It is manifest that this is not the imposition of a charge for mere regulatory purposes only, but is a burden intended to be imposed for revenue purposes, and is therefore a tax, under the doctrines an-

nounced in Ellis v. Frazier, 38 Or. 462, 63 Pac. 642, 53 L. R. A. 454; Reser v. Umatilla County, 48 Or. 326, 86 Pac. 595, 120 Am. St. Rep. 815; Hofer v. Carson, 102 Or. 545, 203 Pac. 323. It is sought to be imposed for the mere privilege of receiving and discharging passengers upon the public streets of Silverton. It is unlawfully imposed because in direct conflict with the express terms of the statute, and is an attempt to exercise power not conferred by the Legislature upon the city. In order for plaintiff to transport passengers for hire between Salem and Silverton, as authorized by the Public Service Commission, it is necessary for him to receive and discharge his passengers upon the public streets of Silverton. He is authorized to transport them to and from Silverton, and he cannot be compelled to receive or discharge them outside of the corporate limits of that city. To receive and discharge passengers upon the public streets of a city is an essential and necessary part of the transportation by automobile busses of passengers from one place to another, and when this is being done in the usual and customary way, under a permit regularly issued by the Public Service Commission, it is not within the power of a municipality to prevent or prohibit it."

The same statute was also construed in Ex parte Fine, 124 Or. 175, 264 Pac. 347, which we cited in our original opinion, and in which the amount of license fee was held to be excessive. The court stated among other things: "The city of Oregon City cannot, under the guise of regulating motor vehicles, *impose a license for revenue purposes or prohibit the use of the streets* of that city by such motor vehicles." See also Union & Service Co. v. Portland, 136 Or. 287, 298 Pac. 919.

We must, accordingly, hold that the city of Cheyenne has neither the power to tax nor the power to prohibit which it claims herein. We see no reason for a rehearing herein, and it is accordingly denied.

*Rehearing denied.*

RINER, Ch. J., and KIMBALL, J., concur.