# HYDE v. BOARD OF COM'RS OF CONVERSE COUNTY

(No. 1846; April 10, 1934; 31 Pac. (2d) 75)

Action by A. E. Hyde against the Board of Commissioners of Converse County. Judgment for defendant, and plaintiff appeals.

102

The cause was submitted for the defendant and respondent on the brief of *John J. McIntyre* of Douglas.

RINER, Justice.

This is a proceeding by direct appeal to obtain the review of a judgment of the District Court of Converse County. For convenience, the plaintiff and appellant,

A. E. Hyde, will be referred to generally as the "plaintiff" or by his own name, and the defendant and respondent, The Board of the County Commissioners of the County of Converse, as simply the "Board" or the "County Board."

The facts out of which this litigation arose are not in dispute and are substantially these:

By an act of the Legislature approved Feb. 11, 1915 (ch. 25, Laws Wyo. 1915), the State of Wyoming "assented to and accepted" the terms and conditions of an Act of Congress entitled "An Act to provide for Cooperative Agricultural Extension Work between the Agricultural Colleges in the several states receiving the benefits of the Act of Congress approved July 2, 1862, and Acts supplementary thereto, and the United States Department of Agriculture." This National law received executive sanction May 8, 1914, and is commonly known as the "Smith-Lever Act." The Wyoming statute above mentioned, as it became a law contained 8 sections. Sections 1, 4, 5, and 6 thereof have been carried forward in subsequent legislation and appear substantially as sections 108-601, 108-603, 108-604, and 108-605, Wyo. Rev. St. 1931; sections 2, 7 and 8 do not concern the subsequent legislative history of the act; its section 3, however, contained the genesis of section 108-602, Wyo. Rev. St. 1931. This section, as originally passed, after authorizing the county commissioners of each of the several counties of the State to provide and appropriate funds for the agricultural extension work, contained therein the following clause.:

"For each dollar so provided by such county there is hereby appropriated, in addition to the appropriation provided for in Section 2 of this Act, the sum of two dollars to be paid out of any moneys in the general fund of the state not otherwise appropriated and to be available when the Secretary of State has been advised by the certificate of the County Commissioners of such

county, countersigned by the president of the State University, that such provision has been actually made and that memorandums of agreement have been entered into between said county and the Agricultural College of the University of Wyoming, said moneys to be turned in to the Treasurer of the Board of Trustees of the University."

In 1921, some change was made by the Legislature in said section (Laws 1921, ch. 64) not material here, but in 1923 it was again altered by amendment so that no provision whatsoever appears therein relative to "memorandums of agreement * * * between said county and the Agricultural College of the University of Wyoming." (Laws 1923, ch. 85). In 1929, the entire section, as amended in 1923, was expressly repealed, and in its stead was substituted the language which now appears as Wyo. Rev. St. 1931, § 108-602, and reads:

"The boards of county commissioners of each county of the state are hereby authorized and empowered to co-operate in extension work in agriculture and home economics in such county, under the supervision of the agricultural college of the university of Wyoming through its extension division; and such boards are authorized and empowered to appropriate and expend out of county funds not otherwise appropriated, such moneys as they may deem expedient for the purposes of such work; provided, that such annual appropriation shall not exceed the sum of one-fourth ($\frac{1}{4}$) mill of the taxable assessed valuation of the county for the previous year."

Section 108-604 is as follows:

"When the county commissioners of any county or district, composed of two or more counties, have complied with the provisions of § 108-602, they shall make a request for a county agent or agricultural expert to be sent them by the agricultural college of the university of Wyoming and the authorities of said university shall provide them with a suitable man, qualified to do the work usually expected from a man edu-

cated in the science of agriculture; provided, an unsatisfactory man shall not be continued as county agent. And it shall be the duty of the agricultural college of the university to carry into effect the provisions of conferring with each board of county commissioners."

Under date of January, 1931, a "contract for co-operative extension service" was undertaken to be entered into between the Trustees of the University of Wyoming, a corporation, the Board of County Commissioners of Converse County, and the United States Department of Agriculture. It bears the duly attested signature, under date of January 7, 1931, of H. A. Gillespie, as Chairman of the Board of County Commissioners of Converse County, and, on the 12th of that month, it appears to have been signed by A. E. Crane, President of the University, purporting to act for said Trustees. It seems, also, to have been executed by one A. E. Bowman, as "Director of Extension," who, as testimony in the record indicates, was acting for both the University of Wyoming and the United States Department of Agriculture. By this memorandum of agreement, the contracting parties covenanted to contribute annually to support the work of "an efficient County Agricultural Agent and Farm Demonstrator," whom it is stated Converse County desired employed, as follows: the county aforesaid should provide—$700 for salary, $2300 for expense, and additionally, an office, office equipment, and "active support by county officials such as the Board may deem suitable"; the University should furnish—$2100 for salary, and also "special lectures, supervision, publications and expert information such as the College may deem suitable"; the United States Department of Agriculture should contribute—$600 for salary, and also "franking privilege, envelope publications and special information such as the Department of Agriculture may deem suitable." The contract, after sundry

provisions indicating the scope and manner of the proposed activities, contained this clause:

"THE TERMS AND CONDITIONS OF THIS CONTRACT shall be and remain in force and effect from January 1, 1931 until at least Jan. 1, 1934 and shall continue in force thereafter unless and until one of the parties shall give the other at least three months previous written notice of its election to terminate the same."

Under date of May 4, 1932, Mr. Crane, as President of the University of Wyoming, wrote the plaintiff offering him employment from July 1, 1932 to June 30, 1933, "at a salary of $3,400, payable in twelve monthly installments." This letter also stated that:

"As the work for which you are engaged is dependent upon the continuance of mutual contracts between the state, the county, and the federal government, it is mutually understood that any break in these contract relations which should make your services no longer needed, would be sufficient grounds for setting aside this contract.

"The Board of Trustees reserves the right to reduce the salary carried by this contract at any time after January 1, 1933, if, in the opinion of the Trustees, financial emergency demands it for the welfare of the University."
The letter was endorsed:

"I hereby accept the above offer under the conditions mentioned.

(Signed) *A. E. Hyde*"

Date 5-12-32

Mr. Hyde, having previously been engaged in the same work in the county, continued to perform his duties as County Agricultural Agent.

On January 7, 1932, the County Board adopted a resolution appropriating divers sums of money for the expenditures of Converse County for the year 1932,

among which is set forth this item: "County Agent— $2750."

The first Monday in January, 1933, the terms of two members of said Board expired and two new officials took over their offices. The membership of the Board having thus been changed, its attitude towards a continuance of the County Agent's work changed also, and at its first meeting in January of that year, it was decided not to co-operate further in the agricultural extension service, and the Board refused to appropriate any funds for work of that character to cover the whole of the current year. It did, however, appropriate sufficient money to carry on the service during the month of January, only. This was made, as one of the members of the Board stated on the witness stand, in order that a hearing could be had to enable the citizens of the county to express their views on the matter. The hearing was apparently duly held but no change resulted in the Board's attitude. January 11, 1933, the plaintiff and also the Trustees of the University were notified of the Board's refusal to appropriate funds, as above described.

Notwithstanding this action of the Board, the plaintiff undertook to act as County Agent during the month of February, and, at the March, 1933, meeting of the Board, presented to it his verified claim for "County Portion Agent's Salary Feb. 1933—$58.33" and "682 Official Auto Mileage"—$58.80, or a total of $117.13. This claim was disallowed and plaintiff instituted suit against the Board to recover the stated amount. Trial to the court without a jury resulted in a general finding in favor of the defendant and a judgment that plaintiff take nothing and that defendant recover its costs.

Several questions have been argued and submitted by counsel for the respective parties but we deem it necessary to consider but one, and that one we think

is controlling in the matter. This question is whether, under the circumstances of the instant case, statutory authority existed which authorized the County Board, in January, 1931, to enter into the alleged contract hereinabove described, for it is upon its validity that plaintiff necessarily relies to succeed in the action.

It is recalled as elementary, as stated by 7 R. C. L. 936-7, § 14, that:

"Counties being created for purposes of government, and authorized to exercise to a limited extent a portion of the power of the state government, have always been held to act strictly within the powers granted by the legislative act establishing them. Accordingly, the statute is to them their fundamental law, and their power is only coextensive with the power thereby expressly granted, or necessarily or reasonably implied from its granted powers."

It is evident that, in the case at bar, the alleged contract as executed was designed to be binding upon the parties thereto over a period of time during a part of which the personnel of the County Board might be and, as a matter of fact, was changed from that which acquiesced in the agreement executed in January, 1931. (Wyo. Rev. St. 1931, § 30-601.) The query is at once suggested whether such an agreement lay within the power of a county board to make.

While counties are, as usually defined, not strictly speaking municipal corporations (15 C. J. 392; Board of Commissioners of Johnson County v. Searight Cattle Co., 3 Wyo. 777, 800, 31 Pac. 268), yet they certainly possess some of their attributes and may be regarded in the category of *quasi* corporations. 15 C. J. 392, supra. In 3 McQuillin Municipal Corporations (2d Ed.) 952, 953, § 1356, the author remarks:

"Respecting the binding effect of contracts extending beyond the terms of officers acting for the municipality, there exists a clear distinction in the judicial

decisions between governmental and business or proprietary powers. With respect to the former, their exercise is so limited that no action taken by the governmental body is binding upon its successors, whereas the latter is not subject to such limitation, and may be exercised in a way that will be binding upon the municipality after the board exercising the power shall have ceased to exist. Consequently independent of statute or charter provisions, it is generally held that the hands of successors cannot be tied by contracts relating to legislative functions but may as to contracts relating to business affairs."

A comprehensive list of cases in support of substantially this statement of the law appears in the annotation note in 70 A. L. R. 794. The note last cited (p. 799), upon the authority of cases from some eleven states and Canada, designates it as the majority rule that:

"In most jurisdictions where a board appoints an officer, or contracts for services, and the duties of the officer or the services to be rendered are duties delegated to the supervision of the board, such appointment or contract for a period beyond the term of the board is not valid. And the same rule applies to confidential relations, such as counsel for the board."

In 15 C. J. 542, it is broadly stated that:

"The general rule is that contracts extending beyond the term of the existing board and the employment of agents or servants of the county for such a period, thus tying the hands of the succeeding board and depriving the latter of their proper powers, are void as contrary to public policy."

And the decisions of eight states of the Union are cited as so holding. Among them is the case of Robbins v. Hoover, 50 Colo. 610, 115 Pac. 526, 528, where it was held that the County Commissioners of Boulder County were without statutory authority to make a binding engagement conclusive on their successors to forever support and maintain a hospital, the court saying:

"Under our laws, a board can expend money, except in designated emergencies, only when it has been previously appropriated for the given purpose. Each year the board must make its various appropriations of money for the necessary public purposes, and levy the necessary taxes to meet them. Within the statutory or constitutional limits each board must for itself determine the tax levy and the amount of such appropriations, and it is beyond the power of any board, in any one year, to determine for its successor in any subsequent year how it shall perform such duties, or prescribe or limit its action in the exercise of governmental functions."

A somewhat different view of the law than that contained in the two excerpts last above given, and which has received the sanction of some authorities, is announced in Bennett v. Petroleum County, 87 Mont. 436, 288 Pac. 1018, 1020. There the County Commissioners of Petroleum County were vested with general statutory authority to lease and purchase property for county purposes. They entered into a four-year lease of, coupled with an option to purchase, certain premises for the use of the county. Overruling the contention that the contract was void because "it purports upon its face to extend the county's obligation beyond the term of office of members of the existing board of county commissioners when the contract was made," the appellate court said:

"The statute specifically confers the power to so contract upon the board of county commissioners, the body existing at the time, and the mere fact that the term of office of a member of the body which so contracts may expire before the contract does not in any manner affect its validity. Were the rule of law otherwise, the business of counties would be very greatly hampered and at times suspended, with resulting damage. The board of county commissioners functions for the municipal corporation in its authorized powers as a continuous body, and, while the personnel of its membership changes, the corporation continues unchanged. The county has power to contract, and its

contracts are the contracts of its board of county commissioners, not of the individual members thereof. Liggett v. Board of County Com'rs, 6 Colo. App. 269, 40 P. 475; Board of County Com'rs v. Shields, 130 Ind. 6, 29 N. E. 385; Webb v. Spokane County, 9 Wash. 103, 37 P. 282; Picket Pub. Co. v. Board of County Com'rs, 36 Mont. 188, 92 P. 524, 13 L. R. A. (N. S.) 1115, 122 Am. St. Rep. 352, 12 Ann. Cas. 986."

It may well be that, in cases of this general character, the controlling principle for judicial guidance should be as stated in 7 R. C. L. 946, § 21, thus:

"In this as in many other instances of seeming conflict, a statement of a positive and inflexible rule either way is not even desirable, for much depends upon questions of duty, expediency, the immediate or reasonable necessities, and other particular circumstances of the case. Under some circumstances the right to legislate prospectively should be upheld, whereas under a different state of circumstances it should be unhesitatingly denied. It is within the range of surmise at least to conceive of a rule in either case that would best be honored in the breach."

And as announced in Moore v. Luzerne County, 262 Pa. 216, 220-221, 105 Atl. 94. That was a case wherein a civil engineer sued the county to recover on a contract of employment relative to furnishing plans, etc., and supervising the construction of a county road. The term of this contract ran beyond that of the county commissioners who had executed it. An objection that the arrangement would tie the hands of the incoming board was upheld, the judgment of the trial court reversed, and the Supreme Court of Pennsylvania very appropriately, as it seems to us, remarked in the course of its disposition of the case:

"It is a mistake to suppose that, because a public official, or indeed any other agent for a known limited term, has power to make a contract, he is authorized thereby to make one for an indefinite or long extended term. If the agency itself does not expressly limit the extent of the agent's power, then the facts and circum-

stances of each case must be considered in determining it. Ordinarily it is limited in time to the term of the agent who makes it. Necessity, or its equivalent of great advantage to the principal, may furnish a reason for enlargement beyond the term, but he who asserts the existence of the necessity or great benefit has the burden of proving it. This is particularly true of public officials, else those going out of office might so tie the hands of those coming in as to cause serious embarrassment and loss to the public. Every one would concede, for instance, that an outgoing board of county commissioners might well contract for the coal needed in the county offices during the existing or ensuing winter, although their terms ceased on the first of January; and every one would likewise concede that their contract for coal to cover a decade would ordinarily be wholly beyond their powers."

In the case at bar, the statutory provisions (Wyo. Rev. St. 1931, §§ 108-602, 108-604) above quoted, when read in the light of the foregoing authorities, do not render the problem before us so very difficult. In our view, the clauses in these statutes most pertinent to the question in hand are those wherein it is enacted that the boards of county commissioners of the several counties of this state "are authorized and empowered to appropriate and expend out of county funds not otherwise appropriated, such moneys as *they may deem expedient* for the purposes of such work; provided, that *such annual appropriation* shall not exceed the sum of one-fourth (¼) mill of the taxable assessed valuation of the county for the previous year." Additionally, we have italicized the especially significant words therein. In this connection, it will be recalled that section 30-106, Wyo. Rev. St. 1931, directs that:

"It shall be the duty of the board of the county commissioners of each county at their meeting to be held in January of each year, or as soon thereafter as possible, to compute the estimated expenses of maintaining the several departments of the county government for the current year, and appropriate so much

money from the several county funds as may be necessary to pay such expenses, and it shall be unlawful for the board of county commissioners to in any manner issue or cause to be issued any certificate of indebtedness, county warrant or other evidence of debt in excess of the anticipated taxes for county purposes for the current year."

All things considered, we regard it as plain that, in a matter of the kind now before us, the Legislature, in enacting ch. 25, Laws Wyo. 1915, with its subsequent changes, never thought that one board of county commissioners in a county should have the exclusive right to determine the moneys to be deemed "expedient" for agricultural extension work, as against all its successors in office. In putting the stamp of its approval upon that act, the lawmaking body can hardly have believed that any single county board would be clothed with vision sufficient to unerringly determine in advance what the scroll of the future should be when fully unrolled. Changing conditions frequently require that what is expedient for one year be deemed as quite inexpedient for the following year, in handling county affairs. The difficult and rapidly altering status of business conditions of the people during the past two or three years is an emphatic illustration of our meaning here. Our conclusion is reinforced by the unmistakable designation in the statute, of the appropriation of the moneys for the "purpose of such work" by the county board as an "annual appropriation" with its extreme limits fixed. This, of course, fully harmonizes, also, with the established rule in meeting county expenditures, as provided in section 30-106, Wyo. Rev. St. 1931, supra.

The obvious intent of the statutory language just discussed was that each board of county commissioners, in the exercise of a fair and sensible discretion, should annually determine what moneys were "expe-

dient" to be employed in this special work and to annually appropriate the amount so determined for such use. That, we think, was the limit of the power of a county board to contract for services of the character we are now considering. Unquestionably, the interests of the people of the respective counties of the state could thus be, at all times, flexibly conserved.

A case in principle closely resembling the one at bar is that of State ex rel. Smith, Atty. Gen. v. Board of Com'rs of Wyandotte County, 131 Kan. 747, 293 Pac. 525. There, the State of Kansas challenged the right of the County Commissioners of Wyandotte County to enter into a contract with a Citizens' Military Committee of that county, wherein it was agreed that the county should pay $2000 a year for a period of fifteen years, as rent on an armory to be built by the committee aforesaid. The commissioners undertook to act under state statutes reading:

"That every city and county in the state of Kansas now having or that may hereafter have a national guard organization within its boundaries is hereby authorized and empowered to render such financial assistance as it may deem wise and patriotic to such national guard organization, either by donating lands or buildings, or donating the use of lands or buildings, or by contributing money to their equipment and maintenance." Section 48-308, Kan. Rev. St. 1923.

"That the governing body or board of county commissioners of every city and county in this state is hereby authorized and empowered to make an annual expenditure in cash for furnishing equipment and maintenance to a national guard organization within its boundaries in a sum not to exceed two thousand ($2,000) dollars." Section 48-309, Kan. Rev. St. 1923. Holding that the Board of Commissioners was entirely without power to execute such an agreement, and after quoting the excerpt from 15 C. J. 542 given hereinabove, the court said:

"The defendants, in support of their contention, cite cases involving the power of cities to make waterworks contracts running over a term of years. Those cases are not persuasive in the present action, because there the cities were specifically empowered to make contracts for furnishing water, running over a period of years. In the present action, no specific authority to make a contract over a period of years is given.

"Section 48-308 of the Revised Statutes specifically gives to the board of county commissioners authority to donate the use of lands or buildings or to contribute money for equipment and maintenance for national guard organizations. The succeeding section gives authority to a board of county commissioners to make annual expenditures not exceeding $2,000 for furnishing equipment and maintenance to a national guard organization. The annual payment of $2,000 is an annual expenditure within the control of the board. Being an annual expenditure, it is within the control of each succeeding board of county commissioners which may or may not make the payment as in its judgment seems best. It follows that the board of county commissioners cannot lawfully make the contract questioned by the state in the present action."

In the case before us, we must, accordingly, hold that the Board of the County Commissioners of Converse County were without legal authority to execute the alleged contract upon which the plaintiff relies, and the judgment of the District Court of Converse County should, therefore, be affirmed.

*Affirmed.*