The **TOWN OF LOVELL, a Municipal Corporation, Appellant (Defendant below),**

v.

**J. W. MENHALL, d/b/a Red Ball Parking Meters, Appellee (Plaintiff below).**

No. 3132.

Supreme Court of Wyoming.

Oct. 29, 1963.

- ◆ -

L. A. Bowman and Bowman & Bowman, Lovell, for appellant.

Robert A. Gish and Zaring & Gish, Basin, for respondent.

Before PARKER, C. J., and HARNS-BERGER, GRAY, and McINTYRE, JJ.

Mr. Justice GRAY delivered the following opinion with which Chief Justice PARKER concurs.

This case is before us on the claim of the Town of Lovell, defendant, that the trial court erred in enforcing against it a contract entered into with plaintiff, J. W. Menhall d/b/a Red Ball Parking Meters, relating to the acquisition, installation, and operation of parking meters by defendant upon the streets of the town. We shall later refer to the merits of the case to the extent thought necessary to meet the somewhat unusual circumstances that have confronted us in reaching a final disposition of the proceeding, but for the moment some comment appears warranted on what has happened to the case here.

The case was submitted on briefs and oral argument on March 20, 1963. Subsequently the contentions of the parties were carefully considered and reviewed and two separate opinions were prepared, neither of which has been accepted by a majority as the opinion of the court. It has proved to be a difficult matter. Two of the justices believe the judgment of the lower court should be affirmed and two justices believe the judgment should be reversed. No doubt such an unfortunate impasse is to be anticipated inasmuch as we are a four-member court, but our difficulty does not end there. We have even been unable to agree on a procedure to be followed where, as a matter of law, a judgment of a lower court must stand affirmed by reason of our equal division. Some members think a short per curiam opinion simply reciting the equal division of the court as the reason for affirmance should be utilized. Other members think this will not suffice.

After some research of the matter of procedure followed by the courts of our sister states and the United States Supreme Court, the writer is convinced that the first alternative is to be preferred. This for the reason that other than Mississippi, none of those courts regard disposition by an equally divided court of a pending case as establishing precedent or settling any principles of law. An informative discussion of the subject is contained in the Mississippi case of Robertson v. Mississippi Valley Co., 120 Miss. 159, 81 So. 799, 800–807, and many decisions of several state courts following the foregoing rule are set forth in the dissenting opinion. See also Hertz v. Woodman, 218 U.S. 205, 30 S.Ct. 621, 622, 54 L. Ed. 1001; Buroker v. Brown, 241 Ind. 421, 172 N.E.2d 849, 850; and 21 C.J.S. Courts § 189c, p. 307. In fact, we seem to be committed to that rule by the early case of McFarland v. Railway Officials' & Employes' Acc. Ass'n of Indianapolis, 5 Wyo. 126, 38 P. 347, 27 L.R.A. 48, 63 Am.St.Rep. 29, rehearing denied 5 Wyo. 126, 38 P. 677, 27 L.R.A. 48, 63 Am.St.Rep. 29, wherein it was said that no weight could be given to the affirmance of a judgment by the United States Supreme Court because equally divided for the reason that such "decision

is not to be considered as settling any principle."

As a consequence, if an opinion discussing in detail the merits of the contentions of the parties upon which the court cannot agree adds nothing to the body of the law, what useful purpose has been served? Courtright v. Legislative Statutory Commission, 100 Colo. 82, 65 P.2d 710, certiorari denied 302 U.S. 695, 58 S.Ct. 13, 82 L.Ed. 537; and Ward v. Davis, 177 Kan. 629, 281 P.2d 1084, 1085. There is grave danger that such opinions will cause misunderstandings and difficulties. Johns v. Johns, 20 Md. 58. For such reason it has become the practice of an overwhelming number of the courts to resort to the short per curiam opinion above mentioned.

What our procedure should be is, of course, a matter for the full court. In this we are not aided by Rule 13, Wyo.Sup.Ct., or the statute, § 5–13, W.S.1957, that relates to the matter. As previously stated, the writer prefers to follow the well-established practice of utilizing the short form per curiam because no compelling or valid reason suggests itself for rejecting the benefits of experience in other courts. However, as also stated, agreement on this score has not been reached and under the circumstances the only alternative would seem to be to set forth briefly the reasons for concluding that the action taken by the trial court should be upheld.

Claiming that defendant had breached the agreement between the parties relating to parking meters by refusing to operate and maintain the same, plaintiff commenced this action seeking damages, or in the alternative, specific performance. Judgment was entered for plaintiff requiring defendant to specifically perform the contract until plaintiff had received the agreed value of the meters or if defendant elected not to perform, to respond in damages. Upon denial of a motion for new trial and without prejudice to its rights on appeal, defendant elected to perform in the event the judgment was affirmed.

The principal contention advanced by defendant is that the contract is vague and ambiguous and having been executed on a printed form prepared and furnished by plaintiff that it must be strictly construed against plaintiff. Under that principle it is then argued that the contract did no more than to create a lease or bailment terminable at will after the first year with option to purchase, and defendant, never having exercised the option, was free to terminate the agreement in its discretion. Plaintiff, on the other hand, contends that the trial court was correct in construing the contract to constitute a binding contract of purchase.

We agree that the contract is somewhat ambiguous in that the language used fails within its four corners to furnish ready identification of the nature of the instrument. However, we are not disposed to apply this rule of construction to the extent suggested by defendant. It appears on the face of the instrument that defendant's attorney reviewed and approved the contract as to form and under those circumstances the rule is limited in application. Bee Bldg. Co. v. Peters Trust Co., 106 Neb. 294, 183 N.W. 302, 304. Further than this, the rule is sparingly applied and when the general object and purpose of the instrument can be ascertained by application of other applicable principles, resort will not be taken to the rule suggested. 17A C.J.S. Contracts § 324, p. 224.

The instrument in question is entitled "LEASE AGREEMENT"[1] and among other things recites that defendant agrees to lease from plaintiff some 224 parking meters of an agreed value of $64.50 each; that defendant is to pay rental equal to 50 percent of the net revenue ·received from use of the meters; and that defendant agrees to maintain the meters in good operating condition until the purchase price is paid. Defendant was also granted the option to purchase the meters by applying rentals which had already been paid against the agreed value and paying the balance due. Plaintiff retained title to the meters

---

[1]. Pertinent provisions of the contract are set forth in the Appendix.

but agreed to deliver title to defendant upon receipt of the agreed value either through payment of rentals in such amount or by defendant's exercising its option in the manner described. It was also provided that the arrangement would be for a trial period of one year following the date of installation of the meters and defendant was granted an option to terminate the agreement by giving written notice 30 days prior to the expiration of the trial period.

In this connection it should also be mentioned that prior to the agreement a sales representative of plaintiff appeared before the town council and quoted a price of $64.-50 for each meter required and also advised the council that it was customary to handle the transaction under a lease agreement whereby one-half of the revenue from the meters was paid to the meter company until the price quoted had been paid in full. The council agreed to proceed in keeping with such understanding and on August 16, 1955, enacted an ordinance with respect to the acquisition, installation, regulation, and use of such meters. In substance the ordinance provided that the meters would be installed at places designated by the mayor and town council, fixed rates to be charged, provided penalties for violation, authorized and directed that the town "shall purchase, lease or otherwise acquire as many meters as may be necessary" and that the cost of acquiring such meters was to be paid out of a percentage of the revenue produced, and "such contract shall provide that the Town of Lovell may discontinue the use of said meters, without obligation, at anytime up to one year from the date of installation." The town council, under date of November 21, 1960, repealed and revoked such ordinance.

In an approach to the contention of defendant as to the contract, the cardinal rule to be kept in mind is that the intention of the parties as exhibited by the language used shall govern, and greater regard is to be had to the clear intent than to particular words used in expressing such intent. Covey v. Covey's Little America, Inc.,

Wyo., 378 P.2d 506, 512; and Fuchs v. Goe, 62 Wyo. 134, 163 P.2d 783, 166 A.L.R. 1329. In Studebaker Bros. Co. of Utah v. Mau, 13 Wyo. 358, 80 P. 151, 153, 110 Am. St.Rep. 1001, rehearing denied 14 Wyo. 68, 82 P. 2, this court was called upon to determine whether a certain instrument was a conditional sales agreement or a chattel mortgage. The principles there stated are particularly pertinent here and in this case it was said:

"The proper construction of contracts of the character of the one involved in this action is always attended with some difficulty by reason of the narrow line of distinction between conditional sale contracts and chattel mortgages; each case depending upon its peculiar or special circumstances. The intention of the parties is to control; and this is to be ascertained from all of the language used in the contract, the circumstances attending the transaction, and the conduct of the parties. * * "

With the foregoing in mind we turn first to the instrument involved. It is true that the parties have labeled it as a "LEASE AGREEMENT" and in the body of the instrument have used words commonly used in those agreements such as "lease," "rentals," and "option." However, it is fundamental that we must look to substance and not to mere form. If the words used are misnomers and do not express the true purpose and intendment of the instrument, we are not compelled to accept their literal meaning. Air Equipment Corporation v. Rubbercraft Corporation, 2 Cir., 79 F.2d 521, 523; Burroughs Adding Mach. Co. v. Bogdon, 8 Cir., 9 F.2d 54, 56; Hervey v. Rhode Island Locomotive Works, 93 U.S. 664–665, 673, 23 L.Ed. 1003; Parke & Lacy Co. v. White River Lumber Co., 101 Cal. 37, 35 P. 442–443; Hurnanen v. Nicksa, 228 Mass. 346, 117 N.E. 325, 326; Hamilton v. Hilands, 144 N.C. 279, 56 S.E. 929–930; and Herring-Hall-Marvin Co. v. Smith, 43 Or. 315, 72 P. 704, 706, 73 P. 340. And the fact that this is done in order openly to avoid appearance of an agreement of

sale is of no particular significance in dealing with the subject matter here involved. Watson v. Commissioner of Internal Revenue, 9 Cir., 62 F.2d 35, 36; Beckwith Machinery Co. v. Matthews, 190 Md. 182, 57 A.2d 796, 175 A.L.R. 1360; and 2 Williston, Sales, § 336, p. 297 (Rev.Ed.1948).

Consequently, we search for further provisions that might sustain defendant's contention that the instrument is a lease or bailment. An essential element to a lease or bailment is a stipulation that return of the property to the lessor or bailor is either required or permitted. Kolb v. Golden Rule Baking Co., 222 Mo.App. 1068, 9 S.W.2d 840, 841, 842. Also see Annotations 17 A.L.R. 1435, 43 A.L.R. 1257, 92 A.L.R. 323, and 175 A.L.R. 1360. Under this contract it is apparent that such element is lacking. True, defendant was granted that right during the trial period of one year but there is no provision granting such right thereafter or a provision from which such right can be implied. In fact, the specific limiting of the grant to the one-year period would seem sufficient to support an inference that no such right existed thereafter. Further, this is affirmed in the ordinance authorizing the contract wherein a condition was imposed that the contract grant defendant such right "at anytime up to one year from the date of installation."

Conversely, we think the instrument taken as a whole substantially supports the finding of the trial court that the contract was intended to be and was a binding purchase agreement. It will be recalled that by the instrument plaintiff retained title to the meters until such time as it received the full agreed value of the meters through payment of so-called rentals or through rentals plus cash that might result from exercise of the option granted defendant. It was also agreed that defendant would maintain the meters in good operating condition until the purchase price was paid. These two elements under the great weight of authority constitute persuasive indicia that the contract was one of conditional sale. For the sake of brevity we shall not under-

take to cite the vast array of authorities on the question and again refer generally to the A.L.R. annotations cited supra. However, the following from the case of In re Midwest Airmoving Corporation, D.C. Ohio, 184 F.Supp. 474, 478, affirmed 6 Cir., 277 F.2d 792, fairly well states the matter:

"In 9 Ohio Jurisprudence, 2d, page 623, Paragraph 7, rule is stated as follows:

" 'The test most frequently applied in determining the character of a contract, as a conditional sale or a lease, is whether the so-called lessee is obligated to accept and pay for the property at some future time; if this is the effect of the contract, it will be construed to be one of conditional sale, and not a lease, notwithstanding the use of terms therein commonly used in leases and not ordinarily used in sales contracts. So too, a contract which purports to be a lease with an option of sale may be a conditional sale and come within the operation of the statutes as to the letter. And even where the so-called lease contains no reference to a prospective purchase, if the real agreement is that the property should belong to the lessee upon the payment of the rental for the term specified, it is a conditional sale'."

Williston, supra, also has this to say:

"Sellers desirous of making conditional sales of their goods, but who do not wish openly to make a bargain in that form, for one reason or another, have frequently resorted to the device of making contracts in the form of leases either with options to the buyer to purchase for a small consideration at the end of the term, provided the so-called rent has been duly paid, or with stipulations that if the rent throughout the term is paid, title shall thereupon vest in the lessee. It is obvious that such transactions are leases only in name. The so-called rent must necessarily be regarded as payment of the price in installments, since the due payment of the agreed amount results, by

the terms of the bargain, in the transfer of title to the lessee.

"This has been clearly recognized and many of the statutes relating to conditional sales in express terms include leases within their scope. Apart from statutes courts have disregarded the form of the transaction and have held that where payment of so-called rent nearly or quite pays the price of the goods the bargain is a conditional sale and is subject to the rules governing that kind of transaction. * * *"

We need not, however, rest entirely on application of those rules. In addition the contract provided that local taxes were to be added to the agreed value and such provision is most common to a sales agreement. Also, the contract relieved plaintiff of replacing any part or parts of meters damaged as a result of vandalism, accidents, acts of God, or other external force, and specifically imposed upon defendant the obligation to maintain the meters in good operating condition until the purchase price was paid. If defendant failed to meet such obligation the plaintff at the city's expense could assume maintenance of the meters. In other words, the city became a self-insurer, and again such fact is strong indicia of a conditional sale. Motor Power Equipment Co. v. Park Transfer Co., 188 Minn. 370, 247 N.W. 244–245.

Aside from the intent gleaned from the contract there is also the circumstance of plaintiff's quoting to the town council a price of $64.50 per meter at the time the town council became interested in acquiring and installing meters and the understanding and acceptance of the council that the transaction, if entered into, would be handled under a lease arrangement until the price quoted had been paid. The ordinance also affirms that understanding.

Having regard for all of these matters, we cannot say that the trial court erred in concluding that the instrument was a binding purchase agreement.

It is next contended that the function is the exercise of the police power of the town

and consequently the contract is unenforceable against it for the reason that the town has in effect relinquished and bartered away, contrary to law, the reasonable exercise of such power. We agree that the function is clearly the exercise of police power. City of Decatur v. Robinson, 251 Ala. 99, 36 So.2d 673; Andrews v. City of Marion, 221 Ind. 422, 47 N.E.2d 968; Morris v. City of Salem, 179 Or. 666, 174 P.2d 192; and State v. Douglas, 117 Vt. 484, 94 A.2d 403. An examination of the contract, however, does not seem to bear out the town's contention. Under the agreement the town has retained a large measure of control. It reserved the right to terminate the agreement at the expiration of the one-year period. It also reserved to itself the adoption and enforcement of regulations with respect to use of the meters; the right to locate the meters; the right to fix the fee or charge commensurate with the undertaking; and the right to collect and disburse the revenue received. Having reserved such control, the mere fact that the town agreed to maintain the meters until the agreed value was paid was not such a "bartering away" or "surrender" of its police power as to render the contract unenforceable. On this phase the town does not agree to refrain from the exercise of the power, but agrees only to continue for a reasonable period to exercise its power to regulate traffic. City of La Mesa v. Freeman, 137 Cal.App.2d 813, 291 P.2d 103; Poole v. City of Kankakee, 406 Ill. 521, 94 N.E.2d 416; McLaughlin v. Housing Authority of City of Las Vegas, 68 Nev. 84, 227 P.2d 206; Comereski v. City of Elmira, 283 App.Div. 556, 128 N.Y.S.2d 913, affirmed 308 N.Y. 248, 125 N.E.2d 241; and Morris v. City of Salem, supra.

Defendant further contends that the contract is void for the reason that the term thereof extends beyond the terms of the members of the town council executing the agreement and thus is an attempt to bind their successors in the exercise of a police power. The exercise of a police power is, of course, the exercise of a govern-

mental power and generally a municipal body, absent specific legislative authority, may not enter into a contract binding upon the municipality for a time extending beyond the terms of members of the board exercising the power. In this connection we might say that the rule is different if the contract deals with proprietary functions. In those instances, absent restraint by the legislature, a municipal body is free to negotiate contracts binding upon the municipality if such contracts are reasonable in length of time and otherwise unobjectionable under the law. Leidigh v. Nebraska City, 138 Neb. 136, 292 N.W. 115; Plant Food Co. v. City of Charlotte, 214 N.C. 518, 199 S.E. 712; Bair v. Layton City Corporation, 6 Utah 2d 138, 307 P.2d 895; 10 McQuillin, Municipal Corporations, § 29.101(3d Ed.); and 37 Am.Jur., Municipal Corporations, § 66.

Again we agree with defendant that there is no statutory provision specifically prescribing the powers and duties of a municipality in acquiring and operating meters for "on-street" parking, but that is not to say a municipality may not act in the premises. The power is implied from the general power to regulate traffic. See such cases as Cassidy v. City of Waterbury, 130 Conn. 237, 33 A.2d 142; Foster's Inc., v. Boise City, 63 Idaho 201, 118 P.2d 721; City of Bloomington v. Wirrick, 381 Ill. 347, 45 N.E.2d 852, certiorari denied 319 U.S. 756, 63 S.Ct. 1175, 87 L.Ed. 1709; Bowers v. City of Muskegon, 305 Mich. 676, 9 N.W.2d 889; Board of Commissioners of City of Newark v. Local Government Board of New Jersey, 133 N.J.L. 513, 45 A.2d 139; Hines v. City of Bellefontaine, 74 Ohio App. 393, 57 N.E.2d 164; Rapid City v. Rensch, 77 S.D. 242, 90 N.W.2d 380. See also list of cases in Part 1, 1 Blashfield's Cyclopedia of Automobile Law and Practice, § 78.10, pp. 148 and 149 (Perm.Ed.1948; Cum. Pocket Part, § 78.10, pp. 42–43, 1962).

It is also true that absent a special statutory method, a municipality is free, within the ambit of its general authority, to adopt reasonable methods and means appropriate to the carrying out of the function and it is not for us to question the wisdom of the manner in which the power was exercised. See Cassidy v. City of Waterbury, supra; Wilhoit v. City of Springfield, 237 Mo.App. 775, 171 S.W.2d 95; Opinion of the Justices, 94 N.H. 501, 51 A.2d 836; Hines v. City of Bellefontaine, supra; Webster County Court v. Roman, 121 W.Va. 381, 3 S.E.2d 631; and Blumenthal v. City of Cheyenne, 64 Wyo. 75, 186 P.2d 556.

In the instant case, having accepted as we feel we must that the contract deals with a governmental function and by its terms extended beyond the terms of members of the town council without the sanction of special legislative authority, it is apparent that there is some basis for the argument of counsel. However, resort to the authorities will disclose that such rule is not always rigidly applied. Changing conditions and business practices have brought about some relaxation of the rule. As was said in Plant Food Co. v. City of Charlotte, supra, "a too rigid adherence to the principle would leave the town council nursing a mere theory,—in the possession of an important governmental power without practical means for its exercise." We recognized this in Hyde v. Board of Com'rs of Converse County, 47 Wyo. 101, 31 P.2d 75. On several occasions the courts have departed from simply classifying the function and the cases have turned on whether or not such contracts were just, fair and reasonable, when prompted by the necessities or advantages of the situation. Denio v. City of Huntington Beach, 22 Cal.2d 580, 140 P.2d 392, 149 A.L.R. 320; Daly v. Stokell, Fla., 63 So.2d 644; Plant Food Co. v. City of Charlotte, supra; and Pitzer v. City of Abilene, Tex.Civ.App., 323 S.W.2d 623. And see particularly Karpark Corporation v. Town of Graham, D.C.N.C., 99 F.Supp. 124, affirmed 4 Cir., 194 F.2d 616, upholding the acquisition of parking meters under a contract substantially similar to the one here. While North Carolina had a statute authorizing enactment of ordinances relating to meters, it contained no authoriz-

ation to purchase meters under an installment plan binding future councils.

Of course, each case must be considered upon the facts and circumstances present, but, like the trial court, we are disposed to refrain from invalidating the contract here under such rule. In the first instance, while the legislature has not specifically authorized such a contract, certain it is that it has acquiesced in the manner in which the town councils have exercised their power in this regard. Section 15–611, W.S.1957, enacted in 1953, relating to "off-street" parking, authorized municipalities using parking meters to divert the revenues therefrom "in excess of the cost of purchase, lease, installation, maintenance and operation" to the acquisition of "off-street" parking. Use of the word "purchase" could have significance only on a deferred payment plan for purchase of meters for "on-street" parking.

The trial court found that defendant had received benefits under the contract and such finding is not challenged here. In the absence of a clear showing to the contrary, the determination by the council of the necessity for the meters to regulate parking will be presumed to be justified by local conditions. Owens v. Owens, 193 S.C. 260, 8 S.E.2d 339, 343; and Western Auto Transports v. City of Cheyenne, 57 Wyo. 351, 118 P.2d 761, 766, rehearing denied 57 Wyo. 351, 120 P.2d 590. There is no claim of fraud or bad faith or that the contract is contrary to public policy. Neither is it claimed that the contract was an apparent effort on the part of departing members to bind successors to an unfair and dishonest act. The subject matter was clearly within the powers of the town council and as noted it was free to adopt reasonable methods and means of exercising such power. In addition, it appears that the contract complies in every respect with the requirements prescribed in the ordinance pertaining to the matter and appears to have resulted from arm's-length bargaining. Of significance also is the fact that at the time the ordinance was repealed, the contract

had been in effect for some five years and for all practical purposes plaintiff had entirely performed all of its obligations thereunder.

For such reasons we think the trial court did not err in upholding the contract against such attack.

It is further suggested that if the contract is held to be a sale and purchase agreement, such holding would run afoul of the constitutional provisions (Art. 16, § 4, Wyo. Const.) with respect to the creation of a debt in excess of the taxes for the current year and statutory provisions relating to the fiscal matters of the town, but we find no merit in this contention. The contract itself, in keeping with the ordinance, created a "special fund" for payment of the meters and specifically provided that the town had "no obligation * * * to pay for the same from any other source." We have heretofore determined that such provisions are not inhibited by the constitution. Snyder v. City of Cheyenne, 79 Wyo. 405, 334 P.2d 750, 752; and Laverents v. City of Cheyenne, 67 Wyo. 187, 217 P.2d 877, 882. Our holdings are in keeping with the general rule that the purchase of property by a city or town to be paid for solely out of revenue from the property purchased does not create a debt or liability in violation of such constitutional or statutory provisions. Morris v. City of Salem, 179 Or. 666, 174 P.2d 192, 197, and authority therein cited.

Lastly, the town insists that the trial court erred in decreeing specific performance or, in the alternative, damages for breach of contract. It is apparent that the relief granted is patterned after the case of Karpark Corp. v. Town of Graham, supra, and in this we do not think the trial court erred. Under our view, the town was obligated to continue to operate and maintain the meters in order to assure available accruals to the special fund until its obligation was discharged. Henning v. City of Casper, 50 Wyo. 1, 57 P.2d 1264, 1275, rehearing denied 50 Wyo. 38, 62 P.2d 304. Under such circumstances and on the rec-

ord before us, we cannot say that the court abused its discretion in requiring performance of that obligation. 2 Restatement, Contracts, § 359, p. 638 (1932). But in any event such relief was in the alternative and even though it is suggested that the theory adopted by the court for fixing the damages was erroneous, we are not called upon to decide that point for the reason that the town has agreed to abide by the decree of specific performance should this court determine, which we have done, that the town was responsible for full performance of the contract. We think we can assume that the town exercised the alternative offered by the trial court in good faith and that the town council will proceed to take the steps necessary to fulfill its obligation.

The judgment should be affirmed.

### Appendix

"RED BALL PARKING METERS
Division of J. W. MenHall Drilling Co.

### LEASE AGREEMENT

\*  \*  \*  \*  \*  \*

"1. The City hereby agrees to lease from The Meter Company and The Meter Company hereby agrees to lease to The City, subject to the terms and conditions hereinafter set forth 224 more or less, RED BALL PARKING METERS (hereinafter called 'meters'). The agreed value of the meters shall be $64.50 each, including pipe and flange, F.O.B. Lovell, Wyoming. The City at any time shall have the option to pur-·chase the meters by applying the rentals which have been paid in by The City to The Meter Company against the agreed value of the meters and paying the balance then due. If the total agreed value shall be paid within sixty (60) days from the date of installation the City may have a discount of six (6) %.

\*  \*  \*  \*  \*  \*

"3. Payments by The City to The Meter Company shall be solely from the receipts, funds and revenues obtained from the operation thereof and there shall be no obligation on the part of The City to pay for the same from any other source. The manner of payment of rental for said meters shall be as follows: All receipts, funds and revenues from the operation of said meters shall be considered 'net revenue'. Upon the fifteenth (15th) day after the installation of said meters and each and every thirtieth (30th) day thereafter The City shall pay as rental to The Meter Company fifty percent (50%) of the net revenue from all meters so installed until The City exercises its option to purchase the meters and/or The Meter Company has received rentals in the aggregate amount of the agreed value of the meters.

\*  \*  \*  \*  \*  \*

"6. It is understood and agreed that the title to all said meters shall be and remain in The Meter Company until and unless the full agreed value thereof, as aforesaid, shall have been paid in cash to The Meter Company, including the rentals aforesaid.

"7. The Meter Company agrees that if The City pays it as rentals the full agreed value of said meters as aforesaid, it will deliver to The City a bill of sale therefor, free and clear of all encumbrances.

\*  \*  \*  \*  \*  \*

"13. The City agrees to maintain the meters in good operating condition until the purchase price is paid. If this is not done, The Meter Company may so maintain them and The City will, upon demand, remit to The Meter Company from The City's share of the net revenue the cost thereof.

"14. The City agrees to set up a special parking meter fund into which all receipts from all meters furnished hereunder shall be placed and kept. \*  \*  \*

"15. This agreement shall be for a trial period of one (1) year commencing from the date of completion of installation. The Meter Company extends and grants unto The City the option to terminate this agreement at the expiration of the trial period by giving The Meter Company written notice thirty (30) days prior to the expiration of said period; \*  \*  \*".

Mr. Justice McINTYRE wrote the following opinion, in which Mr. Justice

HARNSBERGER concurs, for reversal of the district court:

It is undisputed that the lease-agreement form which was used in this case, in consummating the contract of the parties, is a printed form drafted, prepared and furnished by the meter company. The company name is printed at the top and bottom and throughout the form. Apparently it is a form in general use by the company for contracts with cities and towns.

There is good reason to believe and very respectable authority for the proposition that the Town of Lovell acted in a governmental and not in a proprietary capacity when it entered into an agreement for the use of parking meters, and that in consequence it could not bind future town councils under the agreement.

The question in any event being a close one, it is apparent the meter company, in drafting the contract, was obviously attempting to avoid some real or imaginary difficulties concerning the city's authority. Having resorted to devious language, it should not, if the contract is reasonably susceptible of another interpretation, be benefited by its own ambiguities.

If there are indeed ambiguities, they should of course be construed most strongly against the party preparing and employing the words concerning which a doubt arises. See 17A C.J.S. Contracts § 324, p. 217 and cases cited in note 98, also p. 224 and cases cited in notes 99.15, 99.20 and 99.25.

The meter company could not complain if the court refused to read into its contract, by implication, provisions which it either dared not or chose not to express in exact words. If it purposely avoided saying in so many words that the town was to be bound to keep and use the meters until paid for, how can it expect us now to read that into the contract?

Words used in the instrument such as "lease," "option," "rentals," and "agreed value" in the place of "purchase price" have a clear and unambiguous meaning. We need not go outside the instrument itself to know what these words mean. It is somewhat amazing to see how many times implied words have to be substituted for exact words to support the company's theory that its contract was a purchase agreement.

To begin with, the instrument is by entitlement and form made a lease agreement. In paragraph 1, it provides that the city agrees to lease from the company and the company agrees to lease to the city. An "agreed value" but not a purchase price is set out. This paragraph specifically provides the city "at any time" shall have the "option to purchase," but nowhere does it say the city agrees to purchase. *(See Appendix to preceding opinion.)*

Paragraph 3 says payments shall be "solely" from receipts and there shall be "no obligation" to pay from any other source. This makes it doubtful whether such an obligation can be imposed. It is true the paragraph specifies the city shall pay *as rental* 50 percent of the net revenue "until" the city exercises *its option* to purchase or the meter company has received *rentals* in the amount of the *agreed value*.

Even if the word "until," in paragraph 3, were thought of as indicating an intention to state a binding obligation on the part of the town to buy, such an idea is clearly negatived in the same sentence which recognizes the city's "option" to purchase—also, in paragraph 6 which provides for title to remain in the company until and "unless" the full *agreed value* has been paid in full.

According to paragraph 7, the company was to deliver a bill of sale to the city "if" the city pays *as rentals* the full *agreed value*. Again, there is no provision here or elsewhere that the city "shall" pay, except as rentals are paid while the lease is in effect.

The principal argument for the company seems to be centered in paragraph 13. It is like paragraph 3 in the use of the word "until," providing for the city to maintain the meters until the purchase price *is paid*. For the first time the term "purchase price" is used, but in view of the option to buy, the use of such term is not here significant.

If the contract entered into is in fact a lease, then the obligation to maintain "until" the purchase price is paid must certainly be construed as meaning the obligation is to be binding until the purchase price is paid or until the lease is terminated.

No matter what else we may try to read out of or read into the contract of the parties in this case, we cannot ignore the express provision in paragraph 15 that the agreement is for a period of one year. Even though that period is called a "trial" period, it is still an agreement for one year. In the absence of a new agreement after this trial period, there is no reason why the law applicable to the extension and continuation of leases should not apply.

It is true this paragraph says the city has an "option" to terminate at the end of a year, but there is no provision to the effect the city shall be deemed to have bought the meters at the end of that time unless it terminates the agreement. Such a provision should not be read into the contract by implication.

With respect to the situation which exists when a bailment or lease arrangement continues on, by mutual acquiescence of the parties, after the term expressed in the lease instrument has expired, we call attention to §§ 34–60 and 34–61, W.S.1957, which read:

Section 34–60. "In this state there shall not exist the relations of landlord and tenant, by implication or operation of law, except a tenancy by sufferance. Upon the expiration of a term created by lease, either verbal or written, there shall be no implied renewal of the same, for any period of time whatever, either by the tenant holding over or by the landlord accepting compensation or rent for or during any period of such holding over. Such holding over by the tenant and acceptance of rent by the landlord shall constitute only a tenancy by sufferance, with the rights, duties, obligations and incidents of such tenancy."

Section 34–61. "No lease which shall have expired by its own limitation shall be again renewed except by express contract in writing, signed by the parties thereto, whether the original lease be written or verbal. Nor shall any other tenancy than that by sufferance exist after the termination of the original lease, unless created as aforesaid, by express contract in writing."

The foregoing provisions make it clear, at least with respect to real estate, that in Wyoming, after expiration of a lease, there shall be no implied renewal for any period of time whatever; and that a holding over shall create nothing more than a tenancy at sufferance.

It is equally clear, with respect to personal property, that where a bailment of hiring is without specification as to time either the bailor or bailee may terminate at any time. Howes v. Peckham Road Corporation, 14 A.D.2d 940, 221 N.Y.S.2d 221, 222; Sawman Oil Co. v. Bush, Tex.Civ.App., 136 S.W.2d 938, 940; Karp v. Perry, Sup., 164 N.Y.S. 685. See also Truck Leasing Corp. v. Swope, Mo.App., 248 S.W.2d 84, 86; Williams Tilt-up Contractors, Inc. v. Schmid, 52 Wash.2d 429, 326 P.2d 41, 45; and Foley v. John H. Bates, Inc., 295 Mass. 557, 4 N.E.2d 349, 352–353.

In that connection it is to be noted that, in the contract between parties in this case, there is no specification as to time, except for the trial period of one year. Under such a circumstance there is no reason why the agreement could not be terminated at the will of either party, after one year from the date of completion of installation of plaintiff's parking meters.

The fact that a contract called a lease may have some of the characteristics of a conditional sale agreement does not require that it be construed as one, if by its terms it may be held to be a lease. Klivans, Inc. v. Routzahn, D.C.Ohio, 51 F.2d 605, 606; People v. One 1955 Buick 2-Door Coupe, 187 Cal.App.2d 684, 10 Cal.Rptr. 79, 82–83. See also 8 C.J.S. Bailments § 3(2), p. 329.

The most infallible and most approved test to determine whether a contract is one of lease (bailment) or conditional sale **is**

whether there was a binding promise to pay for the goods. If return of the property is either required or permitted, the instrument will be held to be a lease; while, on the other hand, if the so-called lessee is obligated to pay the purchase price, even though such price is designated as rental or hire, the contract will be held to be one of sale. Annotation 175 A.L.R. 1366, at pp. 1382 and 1384.

For other authorities to the same effect, see Earhart v. Callan, 9 Cir., 221 F.2d 160, 163, certiorari denied 350 U.S. 829, 76 S.Ct. 59, 100 L.Ed. 740; United States v. Maulding, D.C., 147 F.Supp. 693, 696, 16 Alaska 566, reversed (on other grounds) 9 Cir., 257 F.2d 56, 17 Alaska 592; Oberan v. Western Machinery Co., 65 Ariz. 103, 174 P.2d 745, 748; State v. Kershaw Manufacturing Company, 273 Ala. 215, 137 So.2d 740, 742; Lee Const. Co. v. L. M. Ray Const. Corp., 219 La. 246, 52 So.2d 841; Hansen v. Kuhn, 226 Iowa 794, 285 N.W. 249, 252; and Motor Power Equipment Co. v. Park Transfer Co., 188 Minn. 370, 247 N.W. 244, 245.

As already mentioned, there is no provision in the instant contract which would bind the Town of Lovell to pay the full agreed value of the parking meters. Its only obligation was to pay a share of the receipts therefrom. Not only that, but actually there is an express provision that there shall be no obligation to pay from any other source. Thus, it is quite clear under the rule stated that in the absence of a promise to pay for the meters, the instrument should be held to be what it purports to be—a lease agreement terminable after one year at the will of either party.

Judgment should have been for the defendant-town and the case ought to be reversed.

Mr. Justice HARNSBERGER concurring in the opinion of Mr. Justice McINTYRE for reversal of the district court:

The town council which contracted for installation of the meters acted within its authority insofar as the meters were to be used within the term of that council's existence, but it was without authority to bind its successors to continue their use thereafter. It follows that the antecedent council could not in any way obligate its successors to continue their use or for payment of the same either as lease rental or in purchase. In 37 Am.Jur., Muncipal Corporations, § 66, p. 679, a distinction is recognized between rights of governmental bodies of municipalities to bind their successors when performing governmental functions and the contractual authority of such bodies in their business or proprietary capacity, saying:

" * * * where the contract involved relates to governmental or legislative functions of the council, or involves a matter of discretion to be exercised by the council, * * * no power of the council so to do exists, since the power conferred upon municipal councils to exercise legislative or governmental functions is conferred to be exercised as often as may be found needful or politic, and the council presently holding such powers is vested with no discretion to circumscribe or limit or diminish their efficiency, but must transmit them unimpaired to their successors. * * * "

Authorities cited amply justify the statement. In East St. Louis & Interurban Water Co. v. City of Belleville, 360 Ill. 490, 196 N.E. 442, 103 A.L.R. 1155, there was a somewhat analogous situation to the present case. The city council there contracted for installation, use, and rental of fire hydrants. In discussing the binding effect of the contract upon council's successors, the court said, "A city cannot, by ordinance or other means, contract away its police power of fixing rates. Such power may be exercised from time to time or even continuously. * * * For the same reason appellant could not bind future city councils by setting up a fixed hydrant rental for the period." (at 196 N.E. 443) If a council cannot bind its successors to a fixed rental for fire hydrants, a council certainly should not be able to

bind those successors to pay rental for parking meters and much less to bind its successors for future payment in purchase of parking meters.

63 C.J.S. Municipal Corporations § 979c, p. 534, also notes the distinction between proprietary and governmental functioning, saying:

"A municipal corporation cannot make a binding contract for the discharge of a purely public duty * * *. However, when a city's public duty does not interfere with its performance of a private service, it may make a valid contract for the use of its instrumentalities in the latter. * * *"

But, "A municipality cannot make contracts which will embarrass or control its legislative powers and duties, or which amount to an abrogation of its governmental function or of its police power."

62 C.J.S. Municipal Corporations § 139, pp. 281–282, likewise says:

"A municipal corporation may, by contract, curtail its right to exercise functions of a business or proprietary nature, but, * * * such a corporation cannot surrender or contract away its governmental functions and powers, and any attempt to barter or surrender them is invalid. Accordingly, a municipal corporation cannot, by contract, ordinance, or other means, surrender or curtail its legislative powers and duties, its police power, or its administrative authority."

However, some doubt has been expressed as to the sufficiency of this type of classification, i. e., governmental or proprietary. The court in Plant Food Co. v. City of Charlotte, 214 N.C. 518, 199 S.E. 712, 714, said "The true test is whether the contract itself deprives a governing body, or its successor, of a discretion which public policy demands should be left unimpaired."

There is a valid difference between contracts of a town or city governing body which merely procure services to carry on its business or proprietary activities and contracts incident to the performance of governmental functions. This would seem to be especially true of contracts which are so intimately related to governmental functioning that they require enactment of ordinances to render them effective. Matters of policy, particularly those within scope of police power (which the contrary opinion concedes was the activity here involved), looking toward the protection of public health, safety, welfare, and convenience, are peculiarly politic and are for discretionary determination from time to time as it may appear to be either necessary or expedient in the judgment of the current body upon or with whom governmental responsibilities lie. The use of meters is so interrelated with ordinances respecting parking, and charges therefor, that any contract for their installation and use involves the discretionary legislative authority of a current council. Hence, a decision as to the wisdom or expediency of enacting such ordinances is a discretionary or governmental function of a town council, and the act of one such council cannot be binding upon its successor. If one council can irrevocably commit a town to a continuing policy or determination, its successors would be robbed of the very authority for which they are selected. Their functions would deteriorate to those of robots and their positions would be that of mere figureheads.

Whether a city is to have parking meters or not lies in the sound discretion of the city fathers just as they may decide either to have or not to have one-way streets. See City of Clayton v. Nemours, 353 Mo. 61, 182 S.W.2d 57, 59, appeals dismissed (two cases) Nemours v. City of Clayton, 323 U.S. 684, 65 S.Ct. 560, 89 L.Ed. 554, citing Cavanaugh v. Gerk, 313 Mo. 375, 280 S.W. 51, 52, which said, "As a police regulation, the city could provide for the safety and convenience of its inhabitants, by ordinance, define the parking places, establish automatic signals and one-way streets, and other regulations," and, in the earlier case of City of Clayton v. Nemours, 237 Mo.App. 167, 164 S.W.2d 935,

942, "a city, under its power to regulate parking, may define and establish zones where parking shall be either limited or prohibited," and "that the ordinance constitutes a proper police regulation may therefore be taken for granted." Parking and its control is essentially a traffic problem and is an element of policing regulation. It is not rendered less so because charge is made by the use of meters for temporary use of street space. Such a practice is but an adjunct to traffic policing and is primarily an aid to policing and enforcing traffic regulation. The payment for space use and penalties for overtime parking are not different from fines for other traffic violations.

No consistency is found in decisions from different jurisdictions in their determination of what functions are governmental and what are proprietary. For instance, in McBean v. City of Fresno, 112 Cal. 159, 169, 44 P. 358, 361, 31 L.R.A. 794, 53 Am.St. Rep. 191, the court held a contract for sewers was not binding upon successors in absence of clear showing of reasonable necessity; but, on the other hand, if it appeared to be prompted by necessities and advantages to the municipality, it would not be construed as an unreasonable restraint upon the powers of successors. In Robbins v. Hoover, 50 Colo. 610, 115 P. 526, it was held an acceptance of a bequest which imposed perpetual obligation to support a hospital was invalid. In State ex rel. Consumers Public Power Dist. v. Boettcher, 138 Neb. 22, 291 N.W. 709, the court held that a municipal water supply system was handled under police or governmental power, yet an electrical light and power system was not. In Leidigh v. Nebraska City, 138 Neb. 136, 292 N.W. 115, it was said a contract for purchase of a park which required payment beyond the mayor's and commissioners' terms of office was invalid as they could not bind their successors.

There are courts which even hold invalid a contract in aid of fire departments as being an attempt to bind successors in performance of their governmental capacities. Commonwealth ex rel. Fortney, for Use of Volunteer Fire Department of Coal Township, Northumberland County v. Bartol, 342 Pa. 172, 20 A.2d 313. Yet courts from that same jurisdiction also held a contract assigning rents from its gas works to be binding upon a council's successors because the function was deemed to be proprietary, even though the contract itself required a subsequent tax levy (a purely governmental prerogative). Graham v. City of Philadelphia, 334 Pa. 513, 6 A.2d 78.

Most courts uphold contracts for water supply as binding on successors upon the ground the supplying of water is a business activity, entirely ignoring the irrefutable fact that water is a health and even a life necessity and thus a matter properly within governmental police power. See Annotation 149 A.L.R. 336, 339, III. But a few states, such as Nebraska in State ex rel. Consumers Public Power Dist. v. Boettcher, supra, at 291 N.W. 709, held to the contrary that such an activity was a governmental function. So, depending upon the distinction drawn to suit the ideas of the particular court between governmental and proprietary functioning, we find the maintenance of a park in one case is said to be a governmental function, that providing for water or sewer may be either proprietary or governmental, even though these services intimately affect the public health and safety, and numerous other oddities.

While the holding of these different courts as to the right of a governmental body or agency to bind their successors has so frequently and even generally turned upon a particular court's own determination that the subject matter involved was either a governmental function or a proprietary activity, the critical point underlying all decisions seems to be whether that which was done was so necessary as to warrant a contract extending beyond the term of office of those who made it.

There is neither equitable nor legal reason which favors the meter company. It stands charged with knowledge of and is bound at its peril to know the contractual power of the town council with which it dealt. 63

C.J.S. Municipal Corporations § 979, p. 530. As a matter of fact, that it had such knowledge is apparent from the very nature of the contract it prepared and induced the council to sign. It carefully avoided wording which said unequivocally that the company would sell and the city would buy the meters for a sum certain under any condition. The contract gives every indication of a purpose to mislead and confuse the lay mind. The company's only loss is discontinuance of rentals at the end of the period for which the town could have lawfully contracted. If the company did not accept the return of the meters, that was the company's own fault.

The contract nowhere requires the town to pay rental for the meters from any other source than from revenues produced from their use; but, notwithstanding the contract does not require the town to pay at all events a purchase price for the meters, the interpretation by the contrary opinion that it was a conditional sale contract can mean nothing other than that the contract created a firm obligation to pay for the meters at all events. In other words, a town indebtedness was incurred by the contract which required the debt be satisfied either by continuing the use of the meters indefinitely until payments from the company's share of the meters' receipts equalled the price fixed as their value or, at all events, as is now authorized by the contrary decision, from future revenues of the town which normally should be under the exclusive control of successors in the government of the town. As payment for the meters was not made within the term of office of the then current administration, the contract was constitutionally violative, because thereby a debt was created in a manner other than by legislatively sanctioned bond issue. Art. 16, § 2, Wyoming Constitution. Furthermore, § 15–127, W.S.1957, requires a town council to annually make appropriation not exceeding the probable amount of revenue to be collected (current revenue), and § 15–129, W.S.1957, prohibits the council from making any contract incurring expense unless appropriation has been made therefor, except under inapplicable conditions. Under the conclusion given the contract by the contrary opinion, the town was committed for a payment which was not to be made from the current revenues nor from funds appropriated for that purpose, thus violating these statutes. If the contract compelled the town to continue the meters in use until such time as the rentals equalled the value of the meters, the contract denied discretion to the successors in the exercise of police power, thus robbing them of their governmental authority.

Lastly, as the contrary opinion holds the contract to be one of conditional sale, and involved a purchase amounting to more than $1,000, it was entered into in violation of § 15–20, W.S.1957, which requires that such contracts be let to the lowest responsible bidder after notice by advertisement containing complete specifications, thus providing for competitive bidding.

The law of this State was settled in this respect in the case of Tobin v. Town Council of Town of City of Sundance, 45 Wyo. 219, 17 P.2d 666, 84 A.L.R. 902. The contract between the town council and a company there considered was for certain street improvement and provided that payment therefor should be one-half cash, the balance by warrants payable not more than one year from date of issue. The cash payment was made, but when the company's claim for payment of the balance was made, slightly more than one year from the date of the contract, the council rejected it and the company sued. The town asserted the contract was void: (1) for failure to obey the provisions of § 1774, W.C.S.1920, because the agreement exceeded $200 and was not let to the lowest bidder after advertisement; and (2) for failure to comply with §§ 1756 and 1757, W.C.S.1920, in that no valid appropriation had been made by the town. Section 1774, W.C.S.1920, is now § 15–20, W.S.1957, but the amount necessary to invoke its requirement for advertisement for competitive bidding is therein raised from $200 to $1,000, but §§ 1756 and 1757, W.C.S. 1920, are now unchanged and appear as §§ 15–127 and 15–128, W.S.1957. In the Tobin

case, the court said the council had disregarded the prohibition of § 1757, W.C.S. 1920 (§ 15–128 W.S.1957), which forbids added corporate expenditures in any one year over and above the amount provided for in the annual appropriation bill of that year, and held against the company's claim that the improvement was a necessity. The decision also sets forth with obvious purpose the provisions of § 1758, W.C.S.1920 (now § 15–129, W.S.1957, without change) requiring that no contract shall be made by a town council and no expense shall be incurred unless an appropriation therefor shall have been previously made.

The only conclusion that may properly be drawn from the opinion in the Tobin case is that up to the time of the contrary decision now rendered, the law in Wyoming was that: (1) Contracts of municipalities for purchases in excess of amounts legislatively prescribed are void unless let to the lowest bidder after advertisement; and (2) that failure of municipalities to comply with the budgeting procedure prescribed by §§ 15–127, 15–128, and 15–129, W.S.1957, render any such contracts void.

The contrary opinion therefore not only violates the constitution and the statutes of this State, but reverses and holds for naught the former decision of this court where questions identical with the instant case were considered.

I agree the judgment should have been for the defendant and the case should be reversed.